BLANK v DEPARTMENT OF CORRECTIONS

Docket No. 109477. Argued October 13, 1999 (Calendar No. 8). Decided June 20, 2000.

Arthur R. Blank and other prison inmates brought an action in the Jackson Circuit Court, challenging the validity of certain prisoner visitation rules adopted by the Department of Corrections. They asserted that the department had enacted the rules in violation of the legislative oversight provisions of the Administrative Procedures Act and that the rules were unconstitutional. The court, Charles A. Nelson, J., denied relief. The Court of Appeals, McDonald, P.J., and Murphy and M. F. Sapala, JJ., affirmed, holding that §§ 45 and 46 of the APA are unconstitutional and void. Additionally, it held that the procedures they establish, effectively empowering the Joint Committee on Administrative Rules to veto administrative rules, fail to satisfy the enactment and presentment requirements of Const 1963, art 4, §§ 1, 22, 26 and 33. It further held that the authority granted to the Joint Committee violates the doctrine of separation of powers, containing no provision for presentment to the Governor for approval of the Legislature's veto of a rule. Its holding severed §§ 45 and 46 from the APA and rendered them void. The Court found the department's visitation rules valid and enforceable, having been promulgated in compliance with the department's enabling statute, as well as with the procedures enunciated in the APA. 222 Mich App 385 (1997) (Docket No. 188881). The petitioners appeal.

In separate opinions, the Supreme Court *held*:

Sections 45 and 46 of the Administrative Procedures Act are unconstitutional as violative of the separation of powers and enactment and presentment provisions of the Michigan Constitution. However, they may be severed from the remainder of the act so as not to render the entire act unconstitutional. The Legislature provided sufficient standards in its statutory grant of authority to the Department of Corrections to promulgate administrative rules so that the delegation passes constitutional muster. Finally, the rules at issue are valid and constitutional.

Justice KELLY, joined by Justices CORRIGAN and YOUNG, stated that MCL 24.245(8)-(10), (12); MSA 3.560(145)(8)-(10), (12) and the first sentence of MCL 24.246(1); MSA 3.560(146)(1) are unconstitutional, and may be severed from the rest of the Administrative Procedures Act without rendering the entire act unconstitutional. The Legislature's reservation of authority to approve or disapprove rules proposed by executive branch agencies violates the Michigan Constitution. Action taken pursuant to that authority is inherently legislative in nature and does not comply with the enactment and presentment requirements of the constitution. It usurps the role of the Governor in the legislative process and violates the separation of powers provision. The Legislature provided sufficient standards in its statutory grant of authority to the Department of Corrections to promulgate administrative rules so that the delegation passes constitutional muster. The department rules at issue are valid and constitutional.

The action of the Joint Committee or the Legislature in exercising the authority granted by §§ 45 and 46 of the APA is inherently legislative, and, thus, subject to the enactment and presentment requirements of the Michigan Constitution. In this case, the action of the Joint Committee or the Legislature in approving or disapproving the rules that agencies have proposed is in essence legislative action. When the Legislature engages in legislative action it must do so by enacting legislation. Failure of the Joint Committee or the Legislature to do so violates the enactment and presentment requirements, usurps the Governor's role in the legislative process, and violates the separation of powers provision. The separation of powers provision and the enactment and presentment requirements act as expressed limitations on the power of the Joint Committee and the Legislature. The Legislature cannot circumvent the enactment and presentment requirements simply by labeling or characterizing its action as something other than legislation. Accordingly, the Joint Committee's and the Legislature's authority under §§ 45 and 46, is unconstitutional.

Where any portion of an act is found to be invalid, severability generally is favored. In this case, the invalid portions of §§ 45 and 46 can be severed without adversely affecting the remainder of the APA.

The enabling act that gives the department the authority to promulgate rules is a constitutional delegation of legislative power to the executive branch. The powers delegated to the director of the department, when read as a whole, are sufficiently limited to pass constitutional muster. Further, the constitution does not require an enabling act to specify in great detail the standards that an execu-

tive branch agency must follow in promulgating rules. In this case, the standards provided by the Legislature make it clear that the director of the department is to promulgate rules to manage and control the department, subject to certain limitations and directions. This provides detail sufficient in context to make the role of the director of the department clearly apparent and to satisfy due process.

The visitation rules promulgated by the department do not exceed the scope of authority that the enabling act delegated to it. They are directly related to the director's responsibility to manage and control the state's prisons, consistent with the legislative intent underlying the enabling act, and are not arbitrary and capricious, being rationally related to the purpose of the enabling act.

Chief Justice WEAVER, writing separately, stated that the legislative veto of §§ 45 and 46 of the Administrative Procedures Act violates the enactment and presentment provisions of the Michigan Constitution and, therefore, violates its separation of powers provision. Further, the offending portions of §§ 45 and 46 creating the legislative veto are severable from the Administrative Procedures Act. The question of the constitutionality of the delegation of rulemaking authority to agencies may be left for another day.

Justice MARKMAN, concurring, stated that 1977 PA 108 is unconstitutional because it exceeds the express limitations on the Legislature's involvement in agency rulemaking under Const 1963, art 4, § 37, and it conflicts with the expressed will of the voters who rejected Proposal A in 1984.

The lead opinion focuses only on the actual moment when the JCAR or the Legislature attempts to participate in the promulgation of agency rules, rather than the validity of the authorization for such conduct by members of the legislative branch. Isolating this single moment in the process ignores the larger context. Rather, the entire process should be examined to determine whether the statute mandating legislative approval of agency rules, which was introduced by bill and met the bicameral and presentation requirements, is constitutional.

With respect to the authority of legislative committees to veto the rules and regulations of the executive branch, the Legislature may do what is specifically set forth in Const 1963, art 4, § 37 and no more. Comparing art 4, § 37 with the role that 1977 PA 108 · attempts to bestow on the JCAR and the Legislature acting without compliance with the Presentment Clause, it must be concluded that 1977 PA 108 is an impermissible expansion of the explicitly limited role provided for the Legislature in the veto of agency rules by art 4, § 37 and, therefore, an encroachment upon the powers assigned

to the executive by the 1963 Constitution. In addition, Proposal A, which would have amended art 4, § 37 to expressly permit the type of legislative approval of proposed agency rules at issue, was rejected by the people.

Affirmed.

Justice CAVANAGH, dissenting, stated that the analysis in this case should begin with Michigan law, which, when applied, requires a different outcome than occurred in *INS v Chadha*, 462 US 919 (1982), on which the lead opinion relies. Under Michigan law, §§ 45 and 46 of the Administrative Procedures Act are constitutional. When the Department of Corrections failed to follow the procedural requirements of §§ 45 and 46, it exceeded the scope of its rulemaking authority. Thus, the rules promulgated by the department are invalid.

Rulemaking pursuant to appropriate statutory procedure, though legislative in character, is not legislation. Executive agencies have rulemaking power only to the extent that they act within the bounds of power conferred upon them by the Legislature. Thus, if the delegation of authority is sufficiently specific, the delegation of power will be valid. The executive agency, nonetheless, must act within prescribed boundaries. If the delegation is not sufficiently specific for the subject matter, the delegation will be constitutionally invalid. Finally, if the delegation is valid, but the executive branch steps outside its bounds, the executive use of power will be invalid.

Under Michigan law, rules do not become effective until they undergo review by the Joint Committee on Administrative Rules. The purpose and effect of committee review is not to legislate; rather, disapproval maintains the status quo ante. Persons who would otherwise be affected by the rules retain the same status because the rules have never been in effect at the time when the committee disapproves. The rights of the executive branch similarly remain unchanged because the executive agency never had the authority to promulgate rules outside the scope of committee review. Instead, committee review is part of the required process. If the agency ignores the procedural requirements imposed by the terms of delegation, the executive has exceeded the power delegated to it and the analysis simply returns to whether the Department of Corrections rules must be invalidated. In this case, the department failed to satisfy the constitutionally valid procedural standards of the Administrative Procedures Act when it proceeded without committee approval. Therefore, the rules cannot stand.

In concluding that committee review involves policy determinations akin to those at issue in *Chadha*, the lead opinion misses the

mark. The question is not simply whether the Legislature is engaged in making policy determinations, but whether the Legislature is engaged in making the type of policy determinations that need to be made in the form of legislation. The analysis of the lead opinion is tied to its misconception that any legislative action taken by a subset of the Legislature is legislation. However, the action taken by the Department of Corrections was more akin to legislation than is the committee review process. Because case law provides that agency rulemaking does not constitute impermissible legislation as long as necessary guidelines are followed, review of agency rules as part of the promulgation process similarly is not legislation, and, therefore, committee review does not violate the Enactment and Presentment Clauses of the Michigan Constitution. *Chadha* is also clearly distinguishable because it repeatedly made reference to "the one-house veto" and placed importance on the bicameralism requirement of the United States Constitution. Committee review is clearly not the same thing as a one-house veto. The Joint Committee on Administrative Rules is composed of senators and representatives. When it disapproves of a rule, both houses are given notice and an opportunity to pass a joint resolution.

Contrary to the positions of the lead opinion and the concurrence, the defeat of Proposal A in the 1984 election has no relevance to this case. While the state of the law remains intact when a proposal is rejected by the voters, rejection of a proposal almost twenty years after the passage of the 1963 Constitution provides no relevant insight into the intent of the electorate who adopted that constitution. The delegates to the constitutional convention in 1961 voted on a constitutional provision distinct from the amendment proposed in 1984, and the concerns that caused "the people" to reject a proposal in 1984 were not necessarily the same concerns that drove "the people" to adopt art 4, § 37 as part of the 1963 Constitution. The law gives little weight to legislative comments made after the passage of a statute or constitutional provision when those comments represent an intent different than that expressed by those who adopted the statute or constitutional provision. To the extent that the rejection of a proposal can even be considered indicative of legislative intent, the rejection of Proposal A in 1984 carries little weight because construing the rejection of Proposal A as a constitutional rejection of the joint committee would be clearly contrary to the language of the APA and contrary to the language of the Michigan Constitution.

Justice TAYLOR took no part in the decision of this case.

Prison Legal Services of Michigan, Inc. (by *Sandra L. Girard*), for the petitioners.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Matthew H. Rick*, Assistant Attorney General, for defendants-appellees.

Amici Curiae:

*Daniel Bambery* for Joint Committee on Administrative Rules and *David Oppliger* for speaker Curtis Hertel.

*White, Przybylowicz, Schneider & Baird, P.C.* (by *Kathleen Corkin Boyle* and *Thomas A. Baird*), for Michigan Education Association.

*Fraser, Trebilcock, Davis & Foster, P.C.* (by *Brandon W. Zuk*), for Michigan State Employees Association, Michigan Association of Governmental Employees, Alfred Neal, and Michael L. Zimmerman.

Kelly, J. We granted leave in this case to review a 1997 Court of Appeals decision[1] in which that Court held unconstitutional §§ 45 and 46 of the Administrative Procedures Act[2] (APA). I would affirm in part.

I. FACTUAL AND PROCEDURAL BACKGROUND

In 1977, the Legislature enacted an amendment to the APA. It required administrative agencies to obtain the approval of a joint committee of the Legislature or the Legislature itself before enacting new administrative rules. The statute now states in relevant part:

---

[1] 222 Mich App 385; 564 NW2d 130 (1997).
[2] 1977 PA 108.

(8) If the committee approves the proposed rule within the time period provided by subsection (6), the committee shall attach a certificate of its approval to all copies of the rule bearing certificates except 1 and transmit those copies to the agency.

(9) If, within the time period provided by subsection (6), the committee disapproves the proposed rule or the committee chairperson certifies an impasse after votes for approval and disapproval have failed to receive concurrent majorities, the committee shall immediately report that fact to the legislature and return the rule to the agency. The agency shall not adopt or promulgate the rule unless 1 of the following occurs:

(a) The legislature adopts a concurrent resolution approving the rule within 60 days after the committee report has been received by, and read into the respective journal of, each house.

(b) The committee subsequently approves the rule.

(10) If the time permitted by this section expires and the committee has not taken action under either subsection (8) or (9), then the committee shall return the proposed rules to the agency. The chairperson and alternate chairperson shall cause concurrent resolutions approving the rule to be introduced in both houses of the legislature simultaneously. Each house of the legislature shall place the concurrent resolution directly on its calendar. The agency shall not adopt or promulgate the rule unless 1 of the following occurs:

(a) The legislature adopts a concurrent resolution approving the rule within 60 days after introduction by record roll call vote. The adoption of the concurrent resolution requires a majority of the members elected to and serving in each house of the legislature.

(b) The agency resubmits the proposed rule to the committee and the committee approves the rule within the time permitted by this section.

*    *    *

(12) If the committee approves the proposed rule within the time period provided by subsection (6), or the legislature adopts a concurrent resolution approving the rule, the

agency, if it wishes to proceed, shall formally adopt the rule pursuant to any applicable statute and make a written record of the adoption. Certificates of approval and adoption shall be attached to at least 6 copies of the rule. [MCL 24.245; MSA 3.560(145).]

An agency shall not file a rule . . . until at least 10 days after the date of the certificate of approval by the committee or after the legislature adopts a concurrent resolution approving the rule. [MCL 24.246(1); MSA 3.560(146)(1).]

Governor Milliken promptly requested an advisory opinion on the constitutionality of the amendments, but this Court declined, stating: "The Court stands ready to examine carefully, and to resolve expeditiously, any controversy that comes to it out of application of 1977 PA 108 in a factual setting." *Request for Advisory Opinion on Constitutionality of 1977 PA 108*, 402 Mich 83, 87; 260 NW2d 436 (1977). That opportunity is now before us.

In 1995, the Department of Corrections (DOC) proposed a series of administrative rules that limited the number and type of persons who could visit a prison inmate. DOC then submitted its proposed rules to the Joint Committee on Administrative Rules (JCAR). At public hearings before JCAR, prisoner rights groups, prisoners' relatives, and other interested persons expressed vigorous opposition to the proposed rules. JCAR did not approve the rules and scheduled more hearings.

DOC then withdrew the proposed rules from JCAR and adopted them without JCAR's approval. DOC forwarded the rules to the Governor and the Office of Regulatory Reform, which, in turn, sent them to the Secretary of State. The rules then became effective without a certificate of legislative or JCAR approval.

In the wake of these events, prison inmates brought actions in the Jackson and Ingham Circuit Courts, challenging the validity of the new visitation rules. They asserted that DOC had enacted the rules in violation of the legislative oversight provisions of the APA and that the rules were unconstitutional. Both courts denied relief.

After consolidating the two cases, the Court of Appeals affirmed. It held that §§ 45 and 46 of the APA are unconstitutional and void. The procedures they establish, that effectively empower JCAR to veto administrative rules, fail to satisfy the enactment and presentment requirements of the Michigan Constitution.[3] 222 Mich App 397-398.

The panel went on to hold that the authority granted to JCAR violates the doctrine of separation of powers. It contains no provision for presentment to the Governor for approval of the Legislature's veto of a rule. *Id.* at 398. The panel's holding severed §§ 45 and 46 from the APA and rendered them void. *Id.* at 402. In addition, the Court of Appeals found DOC's new visitation rules valid and enforceable. They were promulgated in compliance with DOC's enabling statute, as well as with the procedures enunciated in the APA. *Id.*

We granted leave. 459 Mich 879 (1998).

II. ANALYSIS

A. CONSTITUTIONALITY OF PARTS OF §§ 45 AND 46

The first issue before us is whether §§ 45 and 46 of the APA violate the Michigan Constitution by requiring

---

[3] Discussed below, part II(A).

that a joint legislative committee, or the Legislature itself, approve new administrative rules. In making this determination, I recognize that we exercise our power to declare a statute unconstitutional only when the violation is clear. *Gauthier v Campbell, Wyant & Cannon Foundry Co*, 360 Mich 510, 515; 104 NW2d 182 (1960). We review the constitutionality of statutes de novo. *McDougall v Schanz*, 461 Mich 15; 597 NW2d 148 (1999).

The Michigan Constitution contains a provision that separates the powers of the state among three branches of state government. It provides:

> The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution. [Const 1963, art 3, § 2.]

The Michigan Constitution vests the legislative power in the Senate and the House of Representatives. Const 1963, art 4, § 1. The constitution provides that "[n]o bill shall become law without the concurrence of a majority of the members elected to and serving in each house." Const 1963, art 4, § 26. In addition, "[e]very bill passed by the legislature shall be presented to the governor before it becomes law . . . ." Const 1963, art 4, § 33. These provisions of Const 1963, art 4, are the enactment and presentment requirements of the Michigan Constitution.[4]

---

[4] The United States Supreme Court discussed the similar requirements of the federal constitution in *Immigration & Naturalization Service v Chadha*, 462 US 919, 957-958; 103 S Ct 2764; 77 L Ed 2d 317 (1983):

> The bicameral requirement, the Presentment Clauses, the President's veto, and the Congress' power to override a veto were

The Legislature's statutory delegation of authority to executive branch agencies to adopt rules and regulations consistent with the purpose of the statute does not violate the separation of powers provision. *Coffman v State Bd of Examiners in Optometry*, 331 Mich 582; 50 NW2d 322 (1951); *In re Quality of Service Standards for Regulated Telecommunications Services*, 204 Mich App 607; 516 NW2d 142 (1994). The issue here is whether the Legislature, upon delegating such authority, may retain the right to approve or disapprove rules proposed by executive branch agencies.[5]

The United States Supreme Court has ruled that such oversight is not permissible because of the bicameralism and presentment requirements of the federal constitution. *Immigration & Naturalization Service v Chadha*, 462 US 919, 956; 103 S Ct 2764; 77 L Ed 2d 317 (1983). In *Chadha*, the Court addressed the constitutionality of a resolution passed by the United States House of Representatives pursuant to § 244(c)(2)[6] of the Immigration and Nationality Act, 8 USC 1101 *et seq.* The resolution .overrode the Attorney General's decision to suspend the deportation of an individual.

The Court found that the House of Representatives' action was inherently legislative in nature. For sup-

---

intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps. To preserve those checks, and maintain the separations of powers, the carefully defined limits on power of each Branch must not be eroded.

[5] Unlike the dissent, I find this issue to be quite different from that of the constitutionality of delegation of rulemaking authority to executive branch agencies.

[6] 8 USC 1254(c)(2).

port, the Court made four observations. First, the action "had the purpose and effect of altering . . . legal rights, duties and relations of persons . . . outside the legislative branch." *Id.* at 952. Second, the action supplanted legislative action. The only way the House could have obtained the same result would have been by enacting legislation. *Id.* at 952-954. Third, the House's action involved determinations of policy. *Id.* at 954-955. Fourth, the constitution explicitly authorizes only four instances where one house of Congress can act alone. It does not include the authority for one house to exercise a legislative veto over duly authorized actions of the executive branch. *Id.* at 955-956.

The Court then held § 244(c)(2) unconstitutional, because it authorized a house of Congress to exercise legislative power without adhering to the Enactment and Presentment Clause of the United States Constitution.[7] *Id.* at 958. The Court held that the House had exercised legislative power without the approval of the Senate and presentment to the President. By that action, it had violated the bicameralism and presentment requirements of the federal constitution and eroded the "carefully defined" separation of powers. *Id.* at 957-958.

1. *CHADHA* APPLIES TO THIS CASE

We have the discretion to interpret or apply a provision in our state constitution differently than the United States Supreme Court has done with a parallel

---

[7] The United States Constitution requires that, before a bill becomes law, both houses of Congress pass it and, then, that it be presented to the President. US Const, art I, § 7.

provision of the federal constitution. *Doe v Dep't of Social Services*, 439 Mich 650, 674, n 31; 487 NW2d 166 (1992). However, here, I find the United States Supreme Court's reasoning in *Chadha* persuasive and applicable to the Michigan Constitution.

Petitioners argue that *Chadha* should not be applied to this case. They note that *Chadha* stands for the proposition that it is improper for Congress to delegate authority to an executive branch agency, then let one house summarily override that authority. Petitioners assert that this case differs in that, here, the Legislature is not withdrawing any authority. Instead, it is conditioning its delegation of authority on the agency's compliance with APA mandates, including JCAR review.

I disagree. The Legislature passed and the Governor signed the legislation that delegated to DOC the authority to promulgate rules. MCL 791.206; MSA 28.2276. If the Legislature or JCAR invalidates a rule proposed by DOC, it effectively overrides the authority the Legislature has delegated to DOC. In essence, pursuant to §§ 45 and 46, the Legislature has the power to render illusory its delegation of rulemaking authority. Therefore, I find that the provisions of the APA at issue in this case are similar to the legislative veto struck down in *Chadha*.

### 2. SECTIONS 45 AND 46 OF THE APA AUTHORIZE LEGISLATIVE ACTION

When applying *Chadha* to this case, I find that the action of JCAR or the Legislature in exercising the authority granted by §§ 45 and 46 of the APA is inherently legislative. Therefore, it is subject to the enactment and presentment requirements of the Michigan

Constitution. My conclusion is based on the facts of this case.

First, if JCAR or the Legislature can block the implementation of DOC rules, it has the power to alter the rights, duties, and relations of parties outside the legislative branch. The Legislature assigned to the director of DOC the duty to supervise and control the DOC. MCL 791.203; MSA 28.2273. It also delegated to the director the authority to promulgate rules for "[t]he management and control of state penal institutions." MCL 791.206(1)(d); MSA 28.2276(1)(d). Consistent with that statutory assignment and delegation, DOC promulgated the rules at issue in this case. If enforced, the authority of JCAR or the Legislature to block implementation of the rules would effectively interfere with the duty of the director to administer the department. By affecting the duty of the DOC director, who is an individual outside the legislative branch, the action becomes legislative in nature. *Chadha, supra* at 952.

Second, JCAR's failure to approve the rules promulgated by DOC involves policy determinations. Policy determinations are fundamentally a legislative function. *American States Ins Co v DAIIE*, 117 Mich App 361, 367; 323 NW2d 705 (1982). JCAR conducted hearings on the proposed rules. During the hearings, it took testimony and received comments from prisoner rights groups, prisoners' relatives, and other interested parties. After the hearings, JCAR did not approve the rules. Instead, it scheduled another hearing. I do not know to a certainty the rationale behind its failure to approve the rules. However, I reasonably can infer that JCAR considered the testimony and comments received at the hearings. Those deliberations

equate to consideration of the inevitable policy issues that surrounded the proposed rules.

Third, JCAR's action in failing to approve the rules proposed by DOC is inherently legislative in nature, because it supplants other legislative methods for reaching the same result. If JCAR lacked its statutory authority, then the only way that the Legislature could influence the promulgation of the rules would be to enact new legislation. Therefore, I find that the authority vested in JCAR and the Legislature by §§ 45 and 46 of the APA is, in essence, the authority to perform legislative acts.[8]

---

[8] I agree with the dissent that not every action resembling legislation requires the passing of a law, and, therefore, that the Legislature may constitutionally delegate rulemaking authority to executive agencies. However, I find that there is a distinction between executive rulemaking and the JCAR approval process.

When an executive agency such as the DOC interprets a statute it administers by promulgating a rule, the action must be taken within the confines of the enabling statute. In that sense, the agency's action is "checked" by the statute. However, when the Legislature, as here, reserves to itself the power to block agency rules from taking effect, there is no corresponding check. See *Chadha, supra* at 954, n 16. Instead, the Legislature's action exerts a "policy-making effect *equivalent to amending or repealing existing legislation." New Jersey General Assembly v Byrne*, 90 NJ 376, 388; 448 A2d 438 (1982) (emphasis added). Therefore, such actions are subject to the enactment and presentment requirements of our 1963 Constitution. As the Alaska Supreme Court explained in *Alaska v ALIVE Voluntary*, 606 P2d 769, 777 (Alas, 1980), "[t]he fact that [the Legislature] can delegate legislative power to others who are not bound by [the enactment and presentment requirements] does not mean that it can delegate the same power to itself and, in the process, escape from the constraints under which it must operate."

There is also a distinction between the JCAR review process and a proposal that is introduced into a legislative committee. Unlike an executive branch agency with statutory authorization to promulgate rules, a representative or senator has no independent discretionary authority to pass bills. Thus, when a proposal introduced into a legislative committee does not become a bill, the Legislature has not infringed upon any authority granted to a particular legislator. When the JCAR or the Legislature blocks the promulgation of an administrative rule that action limits or effectively revokes the authority granted by the Legislature to an executive branch

3. MICHIGAN'S CONSTITUTIONAL PROVISIONS LIMIT
THE LEGISLATURE FROM ACTING UNILATERALLY
UNDER §§ 45 AND 46 OF THE APA

I have considered the amicus curiae brief of the
Michigan State Employees Association. It notes that
the Michigan Constitution, unlike its federal counter-
part, is a limitation on the Legislature's power, not a
grant of power to it. *Advisory Opinion on Constitu-
tionality of 1976 PA 240*, 400 Mich 311, 317-318; 254
NW2d 544 (1977). Absent a limitation in the Michigan
Constitution, "the Legislature has the power to legis-
late within a particular field." *Federated Publications
v MSU Bd of Trustees*, 460 Mich 75, 83; 594 NW2d 491
(1999). Therefore, the MSEA asserts, there is no con-
stitutional limitation on the Legislature's authority to
approve or disapprove proposed agency rules.[9] Peti-
tioners support that argument. They point out that the
constitution expressly furnishes to JCAR the authority
to suspend the implementation of proposed agency
rules when the Legislature is not in session, without
gubernatorial approval. Const 1963, art 4, § 37.[10]

---

agency. Thus, the dissent's analogy of the JCAR review process to a propo-
sal introduced into a legislative committee is inapposite. See *post* at 175,
n 11.

[9] The dissent states that I misapprehend the argument of petitioner and
amici curiae. Yet the dissent simply restates what I have identified here as
the argument made by them.

[10] The constitutional provision states:

The legislature may by concurrent resolution empower a joint
committee of the legislature, acting between sessions, to suspend
any rule or regulation promulgated by an administrative agency
subsequent to the adjournment of the last preceding regular legisla-
tive session. Such suspension shall continue no longer than the end
of the next regular legislative session.

That the Michigan Legislature may legislate absent constitutional limitations does not mean that it may wield legislative power in a manner other than that carefully prescribed by the Michigan Constitution. As demonstrated above, the action of JCAR or the Legislature in approving or disapproving the rules that agencies have proposed is in essence legislative action. To determine the propriety of such action I consider the separation of powers provision. I consider, as well, the provisions vesting executive power in the Governor, judicial power in "one court of justice," and legislative power in the House and Senate. When the Legislature engages in "legislative action" it must do so by enacting legislation. Failure of JCAR or the Legislature to do so violates the enactment and presentment requirements, usurps the Governor's role in the legislative process, and violates the separation of powers provision. Thus, in this case, the separation of powers provision and the enactment and presentment requirements act as expressed limitations on the power of JCAR and the Legislature. I conclude that the Legislature cannot circumvent the enactment and presentment requirements simply by labeling or characterizing its action as something other than "legislation."

Furthermore, I find that § 37 of article 4 does not support petitioners' position. First, § 37 grants the Legislature the independent authority to temporarily suspend the implementation of a rule promulgated by an administrative agency between regular legislative sessions; § 37 does not grant it the authority permanently to block implementation of a rule. Indeed, a fair reading of § 37 of article 4 suggests that it serves merely as a stopgap measure. It prevents a proposed

rule promulgated between legislative sessions from taking effect before the Legislature has had the opportunity to respond by enacting legislation.

Second, I infer from the *limited* grant of independent authority in § 37 of article 4 that the people of Michigan intended to restrict the Legislature's power over agency rulemaking. The enactment and presentment requirements, as well as the separation of powers provision, restrict that power.

I conclude that, in this case, a committee of the Legislature acted in an inherently legislative manner without adhering to the enactment and presentment requirements of the constitution. Const 1963, art 4, §§ 1, 22, 26, 33. As a consequence, it violated Michigan's Separation of Powers Clause. Const 1963, art 3, § 2.

My holding is consistent with the decisions of the majority of other jurisdictions that have considered this issue. The high courts of eight different states have declared that legislative oversight of executive branch rulemaking is unconstitutional. *Alaska v ALIVE Voluntary*, 606 P2d 769 (Alas, 1980); *State ex rel Stephan v Kansas House of Representatives*, 236 Kan 45; 687 P2d 622 (1984); *Opinion of the Justices*, 121 NH 552; 431 A2d 783 (1981); *New Jersey General Assembly v Byrne*, 90 NJ 376; 448 A2d 438 (1982); *State ex rel Barker v Manchin*, 167 W Va 155; 279 SE2d 622 (1981); *Missouri Coalition for the Environment v Joint Committee on Administrative Rules*, 948 SW2d 125 (Mo, 1997); *Gilliam Co v Oregon Dep't of Environmental Quality*, 316 Or 99; 849 P2d 500 (1993), rev'd on other grounds sub nom *Oregon Waste Systems, Inc v Oregon Dep't of Environmental Quality*, 511 US 93; 114 S Ct 1345; 128 L Ed

13 (1994); *Legislative Research Comm by and through Prather v Brown*, 664 SW2d 907 (Ky, 1984). The courts varied in their reasoning but uniformly resolved that oversight provisions violated the Enactment and Presentment Clauses or the separation of powers provisions in the states' constitutions.

The high courts of two states have decided the matter differently. In *Martinez v Dep't of Industry, Labor & Human Relations*,[11] the Wisconsin Supreme Court upheld a statute that authorized a joint committee to suspend the implementation of administrative rules pending bicameral legislative review and presentment to the governor. There, the legislature can permanently block the promulgation of agency rules only through a legislative act that complies with constitutional requirements of the state constitution. Michigan's APA has no similar provision.

In *Mead v Arnell*,[12] the Idaho Supreme Court agreed with the dissent in *Chadha*. It held that the legislature could constitutionally reject agency-promulgated rules on the basis of a concurrent resolution adopted by each house. The court stated that Idaho's executive branch agencies were not executing the law by promulgating rules. *Id.* at 667. Rather, it reasoned, the agencies were acting according to a legislative delegation of power. Agency rulemaking lacked the constitutional protection from legislative oversight that other inherently executive activities enjoyed. *Id.* Therefore, it was constitutional for the legislature to override agency rulemaking activities without adhering to the formality of the enactment and presentment require-

---

[11]  165 Wis 2d 687; 478 NW2d 582 (1992).
[12]  117 Idaho 660; 791 P2d 410 (1990).

ments of the Idaho Constitution. *Id.*, citing *Chadha*, *supra* at 986-987.

I decline to follow *Mead*, because the Idaho court failed to recognize that passing a resolution to override rules promulgated by an executive branch agency is an inherently legislative action. As I have pointed out, such action has the same purpose and effect as legislation. The Michigan Constitution requires that legislative acts adhere to the enactment and presentment requirements of the constitution. Const 1963, art 4, §§ 1, 22, 26, 33.

In this case, the "legislative acts" did not comply with the enactment and presentment requirements embodied in the Michigan Constitution. Therefore, the acts usurped the role of the Governor in the lawmaking process and violated the separation of powers provision. Const 1963, art 3, § 2. Accordingly, JCAR's and the Legislature's authority under §§ 45 and 46 is unconstitutional.

### B. SEVERABILITY OF §§ 45 AND 46

Having determined that JCAR's and the Legislature's authority to approve or disapprove agency-promulgated rules is unconstitutional, I address whether the offending sections can be severed from the APA. The alternative is to strike down the entire act as unconstitutional. The general rule favors severability:

> In the construction of the statutes of this state the following rules shall be observed, unless such construction would be inconsistent with the manifest intent of the legislature, that is to say:
>
> If any portion of an act or the application thereof to any person or circumstances shall be found to be invalid by a court, such invalidity shall not affect the remaining portions

or applications of the act which can be given effect without
the invalid portion or application, provided such remaining
portions are not determined by the court to be inoperable,
and to this end acts are declared to be severable. [MCL 8.5;
MSA 2.216.]

In *Maki v East Tawas*,[13] this Court noted that MCL
8.5; MSA 2.216 requires us to consider whether a stat-
utory provision ruled unconstitutional is independent
of the remainder of the act in which it is found. *Id.* at
159. In addition, the Court must consider whether the
remainder of the act is "otherwise complete in itself
and capable of being carried out without reference to
the unconstitutional [section]." *Id.* Therefore, I make
a two-step analysis to determine whether we may
sever the invalid statutory provisions from the
remainder of the act. I consider, first, whether the
Legislature expressed that the provisions at issue
were not to be severed from the remainder of the act.
If it did not, then I must determine whether the
unconstitutional portions are so entangled with the
others that they cannot be removed without adversely
affecting the operation of the act.

Turning to the relevant portions of §§ 45 and 46, I
find that there is no express provision in the APA that
prohibits the Court from severing the offending
portions.

Next, I find that we can sever the invalid portions
of §§ 45 and 46 without adversely affecting the
remainder of the APA. Without the provisions authoriz-
ing JCAR or legislative approval, the APA continues to
provide for public notice and an opportunity to be
heard. MCL 24.208; MSA 3.560(108) requires the Mich-

---

[13] 385 Mich 151; 188 NW2d 593 (1971).

igan Register to publish proposed administrative rules. MCL 24.241; MSA 3.560(141) requires a public hearing and notice of hearing before the adoption of a rule.

I find it significant, also, that the APA, as originally enacted, did not include the provisions for JCAR or legislative review of agency-promulgated rules. See 1969 PA 306. Those provisions were not added until the Legislature amended the APA in 1971. See 1971 PA 171. Thus, I find that the original provisions of the APA can remain effective even after the unconstitutional portions from the remainder of the act are severed.

I would sever the offending portions of §§ 45 and 46 from the APA, specifically subsections 8, 9, 10 and 12 of § 45[14] and the second sentence of subsection 1 of § 46.[15] The remaining provisions of the APA would remain in effect.[16]

### C. CONSTITUTIONALITY OF THE ENABLING ACT

The next issue is whether the enabling act that gives DOC the authority to promulgate rules is an unconstitutionally broad delegation of legislative power. The Legislature must provide standards to an administrative agency for the exercise of power delegated to it. In *Blue Cross & Blue Shield of Michigan v Governor*, 422 Mich 1, 51-52; 367 NW2d 1 (1985), the Court stated:

---

[14] MCL 24.245(8)-(10), (12); MSA 3.560(145)(8)-(10), (12).

[15] MCL 24.246(1); MSA 3.560(146)(1). The sentence reads: "An agency shall not file a rule . . . until at least 10 days after the date of the certificate of approval by the committee or after the legislature adopts a concurrent resolution approving the rule."

[16] I would not go as far as the Court of Appeals holding that struck down both §§ 45 and 46 in their entirety.

The criteria this Court has utilized in evaluating legislative standards are set forth in *Dep't of Natural Resources v Seaman*, 396 Mich 299, 309; 240 NW2d 206 (1976): 1) the act must be read as a whole; 2) the act carries a presumption of constitutionality; and 3) the standards must be as reasonably precise as the subject matter requires or permits. The preciseness required of the standards will depend on the complexity of the subject. *Argo Oil Corp v Atwood*, 274 Mich 47, 53; 264 NW 285 (1935). Additionally, due process requirements must be satisfied for the statute to pass constitutional muster. *State Highway Comm v Vanderkloot*, 392 Mich 159, 174; 220 NW2d 416 (1974).

In *Blue Cross & Blue Shield*, the Court considered the constitutionality of a delegation of power to the Insurance Commissioner. It found that, where the delegation simply provided the commissioner with the discretion to "approve" or "disapprove" risk factors proposed by health care corporations, it was unconstitutional.

Here, the statutory delegation of authority to the Director of DOC contains many more limitations on that authority than were present in *Blue Cross & Blue Shield*. The provisions at issue state:

1) The director may promulgate rules pursuant to the administrative procedures act . . . which may provide for all of the following:

a) The control, management, and operation of the general affairs of the department.

*          *          *

d) The management and control of state penal institutions . . . .

*          *          *

3) The director may promulgate further rules with respect to the affairs of the department as the director con-

siders necessary or expedient for the proper administration of this act. [MCL 791.206; MSA 28.2276.]

When the delegation of authority to DOC is examined in total, I find that it contains sufficient guidelines and restrictions. First, the director must abide by the terms of the APA in promulgating new rules. MCL 791.206(1); MSA 28.2276(1). Second, the director may promulgate rules only for the effective control and management of DOC. MCL 791.206(1)(a); MSA 28.2276(1)(a). Third, the director may not promulgate rules that apply to jails owned by municipalities that detain persons fewer than seventy-two hours. MCL 791.206(1)(d); MSA 28.2276(1)(d). Fourth, the director may promulgate rules only as "necessary or expedient for the proper administration of this act." MCL 791.206(3);    MSA 28.2276(3). Fifth, the director may not promulgate rules that prohibit a probation or parole officer from carrying a firearm on duty or that allow a prisoner to have his name changed. MCL 791.206(4); MSA 28.2276(4).

These are but a few of the "guidelines" contained in the enabling statute. Accordingly, I find that the powers delegated to the director of DOC, when read as a whole, are sufficiently limited to pass constitutional muster.

Furthermore, the constitution does not require the enabling act to specify in great detail the standards that an executive branch agency must follow in promulgating rules. *West Ottawa Public Schools v Director, Dep't of Labor*, 107 Mich App 237; 309 NW2d 220 (1981). The Legislature may provide standards in " 'quite general language, as long as the exact policy is clearly made apparent . . . .' " *Id.* at 243 (citation omitted).

Here, I find that the standards make it clear that the director of DOC is to promulgate rules to manage and control DOC, subject to the limitations and directions noted. I find such detail sufficient, in this context, to make the role of the director clearly apparent and to satisfy due process. Therefore, petitioners have not overcome the presumption that the enabling act is a constitutional delegation of power to the executive branch.

### D. CONSTITUTIONALITY OF THE PROMULGATED RULES

The final issue is whether the visitation rules promulgated by DOC exceed the scope of authority that the enabling act delegated to it. In making its determination, the Court considers: "(1) whether the rule is within the subject matter of the enabling statute; (2) whether it complies with the legislative intent underlying the enabling statute; and (3) whether it is arbitrary and capricious." *Dykstra v Dep't of Natural Resources*, 198 Mich App 482, 484; 499 NW2d 367 (1993), citing *Luttrell v Dep't of Corrections*, 421 Mich 93, 100; 365 NW2d 74 (1984).

I find that the rules are within the subject matter of the enabling act. The enabling act delegates authority to DOC to promulgate rules for the management and control of DOC and the state's prisons. MCL 791.206; MSA 28.2276. The rules at issue limit who may visit prisoners and how many times a prisoner may have visitors. Such rules are directly related to the director's responsibility to manage and control the state's prisons. Therefore, the DOC's rules meet the first prong of the test.

.

I find also that the rules promulgated by DOC are consistent with the legislative intent underlying the enabling act. The Legislature gave DOC broad authority to make rules necessary to manage and control the prison system. MCL 791.206; MSA 28.2276. I infer from that broad grant of authority that the Legislature intended DOC to address specific issues, such as visitation rules and guidelines, as in this case.

Finally, I find that the rules that DOC promulgated are not arbitrary and capricious. A rule is not arbitrary or capricious if it is rationally related to the purpose of the enabling act. *Dykstra, supra* at 491. DOC has proffered that it set forth the rules "to increase the security of the state's penal institutions, to assure the safety of both the residents of and the visitors to these facilities, and to reduce the incidence of contraband smuggled into such facilities."

I find that rules promulgated for such purposes are rationally related to the authority of DOC to manage and control the state's prison facilities. MCL 791.206; MSA 28.2276. Therefore, the DOC rules at issue in this case meet the *Dykstra/Luttrell* test for validity, and I would uphold them as proper.

Petitioners' final argument is that DOC's rules limiting visitation violate prisoners' rights to due process, free exercise of religion, and the effective assistance of counsel. I find petitioners' argument unfounded for the reasons set forth in the Court of Appeals opinion. 222 Mich App 408-409; see also *Bazzetta v McGinnis*, 124 F3d 774 (CA 6, 1997), supplemented 133 F3d 382 (CA 6, 1998); *Bazzetta v Dep't of Corrections Director*, 231 Mich App 83; 585 NW2d 758 (1998). Accordingly, I would affirm the Court of Appeals holding on that issue.

### III. CONCLUSION

The Legislature's reservation of authority to approve or disapprove rules proposed by executive branch agencies violates the Michigan Constitution. Action taken pursuant to that authority is inherently legislative in nature and does not comply with the enactment and presentment requirements of the constitution. Accordingly, it usurps the role of the Governor in the legislative process and violates the separation of powers provision. Therefore, I would hold that subsections 8, 9, 10, and 12 of § 45 and the first sentence of subsection 1 of § 46 are unconstitutional.

I also would hold that the offending portions of §§ 45 and 46 may be severed from the rest of the APA without declaring the entire APA unconstitutional. I would distinguish this holding from that of the Court of Appeals, because it would not strike down §§ 45 and 46 in their entirety. This holding would sever only the specified portions of the sections. The remaining portions would remain effective.

In addition, I would hold that the Legislature provided sufficient standards in its statutory grant of authority to DOC to promulgate administrative rules so that the delegation passes constitutional muster. Finally, I would hold that the rules at issue in this case are valid and constitutional.

CORRIGAN and YOUNG, JJ., concurred with KELLY, J.

WEAVER, C.J. I write separately to concur in the holding and result of the lead opinion regarding the unconstitutionality of the legislative veto of §§ 45 and

46 of the Administrative Procedures Act.[1] The legislative veto violates the enactment and presentment provisions of the Michigan Constitution, Const 1963, art 4, §§ 1, 22, 26, 33, and, therefore, violates the separation of powers, Const 1963, art 3, § 2. Further, I agree with the lead opinion that the offending portions of §§ 45 and 46 creating the legislative veto are severable from the Administrative Procedures Act. I leave to another case the question of the constitutionality of the delegation of rulemaking authority to agencies.

MARKMAN, J. Although I concur in the result reached by the lead opinion, I write separately because: (1) I do not agree with the lead opinion's reliance on the rationale from *Immigration & Naturalization Service v Chadha*, 462 US 919; 103 S Ct 2764; 77 L Ed 2d 317 (1983),[1] and (2) I do not agree that 1977 PA 108 violates the Enactment and Presentment Clauses of the Michigan Constitution. However, I agree with the lead opinion's result because the challenged involvement by the Legislature in the implementation phase of agency rulemaking: (1) exceeds the limits of such involvement provided for by Const 1963, art 4, § 37, and (2) conflicts with the expressed will of the voters who rejected Proposal A in 1984.

---

[1] Specifically, subsections 8, 9, 10, and 12 of § 45 and the first sentence of subsection 1 of § 46

[1] In *Chadha*, a majority of the United States Supreme Court invalidated a section of the Immigration and Nationality Act that permitted either House of Congress, by passing a resolution, to veto an Attorney General's decision to suspend the deportation of an alien. The articulated basis for this holding was that the veto power sought to be exercised under the challenged section was "legislative action" overriding the Attorney General's exercise of statutorily authorized discretion and, therefore, in violation of the bicameral and presentment requirements of US Const, art I, §§ 1 and 7.

I

This case arises from a dispute concerning whether the Michigan Department of Corrections (MDOC) could legitimately promulgate new rules pursuant to an enabling act[2] without first complying with certain steps under the Administrative Procedures Act (APA) that were added by 1977 PA 108. The challenged procedures require proposed rules to be submitted by the proposing agency to the Michigan Legislature's Joint Committee on Administrative Rules (JCAR) and be approved either by the JCAR or, if JCAR approval is not forthcoming, by concurrent resolution of the Legislature, before becoming effective. See MCL 24.245-24.246; MSA 3.560(145)-3.560(146).

From its inception, the constitutionality of the Legislature's involvement, pursuant to 1977 PA 108, at the implementation phase of agency rulemaking has been questioned, but this Court properly found it necessary to wait for the issue to arise in an actual case or controversy. See *Request for Advisory Opinion on Constitutionality of 1977 PA 108*, 402 Mich 83; 260 NW2d 436 (1977). In 1984, the voters rejected Proposal A, which would have amended Const 1963, art 4, § 37 to expressly permit the Legislature, or a joint

---

[2] The enabling act in question provides, inter alia, the director of the MDOC with the authority to promulgate rules for:

(a) The control, management, and operation of the general affairs of the department.

*        *        *

(d) The management and control of state penal institutions, correctional farms, probation recovery camps, and programs for the care and supervision of youthful trainees . . . . [MCL 791.206(1); MSA 28.2276(1).]

committee thereof, to approve or disapprove, in any manner provided by law, any rule proposed by an administrative agency.

In 1995, the MDOC formulated rules to implement a new standardized visitation policy, and commenced the procedures for promulgating new administrative rules under the APA. This included holding public hearings and submitting the proposed rules to the JCAR. The JCAR did not initially approve the proposed rules, but, before a second scheduled hearing could be conducted, the MDOC withdrew the rules from JCAR consideration and forwarded them to the Governor and the Office of Regulatory Reform. The rules were then promulgated without approval by the JCAR or the Legislature when they were transmitted by the Office of Regulatory Reform to the Secretary of State.

Separate actions for mandamus and an injunction, seeking to block application of the new rules by the MDOC, were unsuccessful in the trial courts, and were consolidated in the Court of Appeals. The Court of Appeals found that the requirement that proposed agency rules be approved by the JCAR or the Legislature before becoming effective "fails to satisfy the enactment and presentation provisions of the Michigan Constitution," and "[i]n a broader sense, . . . violates the doctrine of separation of powers." 222 Mich App 385, 389, 398; 564 NW2d 130 (1997).

II

The analysis of whether it is constitutional for a statute to require that the JCAR or the Legislature approve new administrative rules before they can

become effective, pursuant to 1977 PA 108, entails de novo review that starts from the presumption that the statute is constitutional, and recognizes a violation only if its unconstitutionality is clear. *McDougall v Schanz*, 461 Mich 15, 24; 597 NW2d 148 (1999). We must look for the meaning of our constitution by a search for "what law the people have made" *People v Reichenbach*, 459 Mich 109, 119; 587 NW2d 1 (1998), indirectly quoting *People v Harding*, 53 Mich 481, 485; 19 NW 155 (1884). "The first rule a court should follow in ascertaining the meaning of words in a constitution is to give effect to the plain meaning of such words as understood by the people who adopted it." *Bond v Ann Arbor School Dist*, 383 Mich 693, 699; 178 NW2d 484 (1970).

The lead opinion follows the reasoning of *Chadha* to determine that what the JCAR or the Legislature does when it blocks the promulgation of proposed agency rules is "legislative action,"[3] concluding that this amounts to legislation without compliance with the enactment and presentment requirements.[4] However, given that this Court is not bound to follow the United States Supreme Court's constitutional construction when interpreting the Michigan Constitu-

---

[3] The *Chadha* majority presumed that when one House of Congress acts it is acting within the powers properly assigned to it under the United States Constitution; then it held that a one-house legislative veto was within the category of legislative actions subject to bicameral and presentment requirements because it: (1) altered the rights, duties, and relations of persons outside the legislative branch; (2) supplanted legislative action; (3) involved determinations of policy; and (4) was not among the situations enumerated in the United States Constitution where one House of Congress was authorized to act alone. *Chadha*, *supra* at 952-958.

[4] The Michigan Constitution provides that "[a]ll legislation shall be by bill," art 4, § 22, and that "[e]very bill passed by the legislature shall be presented to the governor before it becomes law," art 4, § 33.

tion,[5] I would adopt what I perceive to be the better reasoned approach of Justice White's *Chadha* dissent.[6] Justice White made these observations:

> Without the Legislative veto, Congress is faced with a Hobson's choice: either to refrain from delegating the necessary authority, leaving itself with a hopeless task of writing laws with the requisite specificity to cover endless special circumstances across the entire policy landscape, or in the alternative, to abdicate its law-making function to the executive branch and independent agencies. To choose the former leaves major national problems unresolved; to opt for the latter risks unaccountable policymaking by those not elected to fill that role. [*Chadha, supra* at 968 (White, J., dissenting).]

> The history of the legislative veto also makes it clear that it has not been a sword with which Congress has struck out to aggrandize itself at the expense of the other branches—the concerns of Madison and Hamilton. Rather, the veto has been a means of defense, a reservation of ultimate authority necessary if Congress is to fulfill its designated role under Article I as the nation's lawmaker. While the President has often objected to particular legislative vetoes, generally those left in the hands of congressional committees, the Executive has more often agreed to legislative review as the price for a broad delegation of authority. To be sure, the President may have preferred unrestricted power, but that could be precisely why Congress thought it essential to retain a check on the exercise of delegated authority. [*Id.* at 974.]

> The Constitution does not directly authorize or prohibit the legislative veto. Thus, our task should be to determine

---

[5] See *City of Mesquite v Aladdin's Castle, Inc*, 455 US 283, 293; 102 S Ct 1070; 71 L Ed 2d 152 (1982); *Sitz v Dep't of State Police*, 443 Mich 744, 758-759; 506 NW2d 209 (1993).

[6] Justice Rehnquist authored a separate dissent in which Justice White also joined.

whether the legislative veto is consistent with the purposes of [US Const] art. I and the principles of Separation of Powers which are reflected in that Article and throughout the Constitution. We should not find the lack of a specific constitutional authorization for the legislative veto surprising, and I would not infer disapproval of the mechanism from its absence. From the summer of 1787 to the present the government of the United States has become an endeavor far beyond the contemplation of the Framers. Only within the last half century has the complexity and size of the Federal Government's responsibilities grown so greatly that the Congress must rely on the legislative veto as the most effective if not the only means to insure their role as the nation's lawmakers. [*Id.* at 977-978.]

The power to exercise a legislative veto is not the power to write new law without bicameral approval or presidential consideration. The veto must be authorized by statute and may only negative what an Executive department or independent agency has proposed. On its face, the legislative veto no more allows one House of Congress to make law than does the presidential veto confer such power upon the President. [*Id.* at 980.]

[T]he Framers were concerned with limiting the methods for enacting new legislation. The Framers were aware of the experience of Pennsylvania where the legislature had evaded the requirements attached to the passing of legislation by the use of "resolves," and the criticisms directed at this practice . . . . There is no record that the Convention contemplated, let alone intended, that these Article I requirements would someday be invoked to restrain the scope of Congressional authority pursuant to duly-enacted law. [*Id.* at 981-982.]

I fear it will now be more difficult [as a result of the majority's decision] "to insure that the fundamental policy decisions in our society will be made not by an appointed official but by the body immediately responsible to the people . . . ." [*Id.* at 1002-1003.]

Because I agree with this reasoning, I do not gener-
ally view a statutorily authorized legislative veto over
proposed agency rulemaking as unconstitutional.
Essentially, such a veto procedure represents an
attempt by the legislative branch of government to
counterbalance the problem within the modern
administrative state of the delegation to the executive
branch of government of what was once viewed as
legislative power.[7] Such delegations themselves per-
mit executive agencies to pervasively regulate, i.e.,
legislate, without satisfying the enactment or present-
ment requirements of the state constitution. For this
Court over the years to have countenanced such dele-
gations of essentially legislative authority, yet now to
insist that the Legislature cannot attempt to staunch
this loss of authority through the enactment of a leg-
islative veto, would be, in my judgment, to alter the
balance of separation of powers, but for the existence
of the Michigan-specific circumstances[8] described in

---

[7] The current test to distinguish when agency rulemaking authority is
an invalid delegation of legislative power and when it is a valid authoriza-
tion to use discretion in the implementation of the law is whether the ena-
bling act, together with any applicable administrative safeguards, provides
sufficient standards "as reasonably precise as the subject matter requires
or permits," so that the rulemaking authority can be construed as "confer-
ring administrative not legislative power and as vesting discretionary, not
arbitrary authority." *People v Turmon*, 417 Mich 638, 644; 340 NW2d 620
(1983), quoting *Dep't of Natural Resources v Seaman*, 396 Mich 299, 309;
240 NW2d 206 (1976), quoting *Argo Oil Corp v Atwood*, 274 Mich 47, 53;
264 NW 285 (1935) (internal quotation marks omitted). See also *Westervelt
v Natural Resources Comm*, 402 Mich 412, 436-437; 263 NW2d 564 (1978)
(WILLIAMS, J.).

[8] Given that we are interpreting the Michigan Constitution, Michigan-
specific circumstances are of overriding importance. The lead opinion
notes that the high courts of eight sister states have found legislative
vetoes of agency rulemaking to be unconstitutional under their respective
state constitutions, while two states have upheld them. However, like
Michigan, none of these states is obligated to follow federal analysis when

part III.[9]

The central difference between the lead opinion's approach and my own is that, in my judgment, the lead opinion focuses only on the actual moment when the JCAR or the Legislature attempts to participate in the promulgation of agency rules (i.e., it examines only the legislative veto itself), rather than the validity of the authorization for such conduct by members of the legislative branch. Isolating this single moment in the process ignores the larger context. By contrast, I would examine the entire process to determine

---

interpreting their own constitutions. See *City of Mesquite*, n 5 *supra* at 293. Consequently, a tally of the respective outcomes of these decisions is not nearly so persuasive as consideration of the state-specific circumstances that supported the results under the respective state constitutions. In *Martinez v Dep't of Industry, Labor & Human Relations*, 165 Wis 2d 687; 478 NW2d 582 (1992), where the Wisconsin Supreme Court upheld the legislative veto provision at issue (which involved only temporary suspension by a legislative committee), that court noted Wisconsin's historical view of its implied separation of powers doctrine and the important public policy of ensuring that "elected officials [are] accountable for rules governing the public welfare." *Id.* at 701. The Idaho Supreme Court, which also upheld the constitutionality of a legislative veto over agency rulemaking, found that the view expressed by Justice White in his *Chadha* dissent comported with the separation of powers principles embodied in the Idaho Constitution. *Mead v Arnell*, 117 Idaho 660, 667-669; 791 P2d 410 (1990). However, despite their sound reasoning, in my judgment, neither of these courts was faced with a constitutional provision comparable to Const 1963, art 4, § 37 or a popular rejection of a proposal to change this provision. As a contrasting example, in *Alaska v ALIVE Voluntary*, 606 P2d 769, 775 (Alas, 1980), a pre-*Chadha* case where a statutorily authorized legislative veto was struck down, the court found that the specificity that the Alaska Constitution used when dealing with express legislative veto powers "leads logically to the conclusion that no other veto power is implied."

[9] That the legislative branch itself has been responsible for the delegation of what may be its own powers is no response to the instant proposition that this Court has not been equally vigilant in defending the prerogatives of the legislative branch as it is here in defending those of the executive branch. As Const 1963, art 4, § 1 states, "The legislative power of the State of Michigan is vested in a senate and a house of representatives." The Legislature has no authority to delegate the "legislative power," and the judiciary has no authority to countenance such a delegation.

whether the statute mandating legislative approval of agency rules, which was introduced by bill and met the bicameral and presentation requirements, is constitutional.

Here, if the legislative veto had not been passed by both houses of the Legislature, or had not been presented to the Governor, I would have no difficulty agreeing that such a deficiency would be constitutionally fatal. Likewise, if the veto purported to bestow on the JCAR, or the Legislature as a whole, the power to enact new laws without approval of both houses and presentment to the Governor, I would not hesitate to strike it down on the basis of the enactment or presentment requirements of the constitution. However, I see no applicability of these requirements to statutorily authorized participation by the JCAR or the Legislature in the implementation of previously enacted enabling statutes.[10]

III

A

Clearly, determining whether 1977 PA 108 is constitutional requires us to interpret the Michigan Constitution. This Court's obligation in that regard is to find the law that the people have made, see *Reichenbach, supra* at 119. This, of course, is consistent with the view expressed by Justice White when he stated that the Court's "task should be to determine whether

---

[10] It may be true that the only *other* way that the Legislature could block the promulgation of proposed rules would be to pass a bill and present it to the Governor. However, the current focus should be on what the Legislature actually did by enacting and attempting to use 1977 PA 108, and not on what the Legislature could or could not have done had it tried to accomplish the same objective by another method.

the legislative veto is consistent with the purposes of [US Const] Art. I and the principles of Separation of Powers that are reflected in that Article and throughout the Constitution." *Chadha, supra* at 977.

"Separation of powers" under the Michigan Constitution is no more, and no less, than the sum of the specific constitutional provisions assigning or limiting particular powers and functions among the three separate branches of state government.[11] Consequently, it is meaningless to say that a particular statute violates the doctrine of separation of powers without first finding a specific constitutional violation grounded in the language or overall structure of the constitution.[12] Questions that aid in identifying a violation of a specific provision assigning or limiting power include: (1) what are the limits of the particular power assigned by the constitution to a particular branch? and (2)

---

[11] When viewed in this manner, it becomes clear that the powers of the three branches of government do not overlap, but their *exercise* often does. The legislative branch does not share any of the executive branch's power to implement the law, and the executive branch does not share any of the legislative branch's power to make the law, but in the exercise of these respective powers, there may be some overlap and, consequently, some amount of tension.

[12] Const 1963, art 3, § 2, states:

The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.

However, this "separation of powers" statement appears neither to add to, nor detract from, separation of powers principles already expressed or inherent in the Michigan Constitution by virtue of the specific provisions allocating or limiting the power of the government to be wielded by the separate branches of government. In this sense, Const 1963, art 3, § 2 is analogous to the statement of the federalism principle set forth in Amendment X of the United States Constitution, a principle already made clear by the other more specific provisions of that constitution.

what limitations upon the power of one branch are implied in those granted to another?[13]

Hence, the starting point for determining whether 1977 PA 108 is consistent with the sum of the specific constitutional provisions assigning or limiting specific powers and functions among the three branches of state government, is the language and overall structure of the Michigan Constitution. The Michigan Constitution vests: (1) the legislative power of the state of Michigan in the Senate and House of Representatives, Const 1963, art 4, § 1, (2) the executive power in the Governor, Const 1963, art 5, § 1, and (3) the judicial power exclusively in one court of justice, Const 1963, art 6, § 1. Against this background, we should turn to consideration of more specific constitutional provisions granting or limiting powers. Of central importance to the instant analysis is art 4, § 37.

B

As the lead opinion notes when addressing whether the nondelegation doctrine has been violated, the

---

[13] In answering these questions, it is important to bear in mind that the only separation of powers issue under consideration here is the constitutionality of legislative involvement in the promulgation of rules proposed by an administrative agency pursuant to authority bestowed by the Legislature under an enabling act. This is not a case where the MDOC contends that it wields inherent authority to promulgate internal rules regarding visitation policies at prisons that it administers. While it would seem self-evident that running a prison would necessarily require setting some internally enforceable "rules" with regard to visitation, which may not be on par with administrative rules as defined by the APA, see MCL 24.207; MSA 3.560(107), and that a legislative scheme permitting the Legislature to unilaterally involve itself in such day-to-day administrative decisions necessarily implicates the separation of powers doctrine, this is not our present concern. Nonetheless, when I consider 1977 PA 108 in view of MCL 24.207(k); MSA 3.560(107)(k), I understand that a reasonable argument might have been made in support of the proposition that some provisions of 1977 PA 108 encroach on the inherent assignment of executive power to the executive branch by Const 1963, art 5, § 1.

implementation of a law through a proper grant of authority to promulgate rules, once the necessary authority has been validly delegated, is considered a proper executive function. *People v Turmon*, 417 Mich 638, 644-645, 648-649; 340 NW2d 620 (1983). However, Const 1963, art 4, § 37, defines a limited role for the Legislature to thereafter involve itself in the agency rulemaking process, stating:

> The legislature may by concurrent resolution empower a joint committee of the legislature, acting between sessions, to suspend any rule or regulation promulgated by an administrative agency subsequent to the adjournment of the last preceding regular legislative session. Such suspension shall continue no longer than the end of the next regular legislative session.

Like the lead opinion, I draw certain inferences from this limited grant of authority. Primarily, I infer that the people who adopted the 1963 Constitution, and chose to permit the Legislature to empower a legislative committee only to temporarily suspend rules, and only those promulgated between legislative sessions, did not intend to authorize their Legislature to unilaterally and permanently block the promulgation of agency rules by bestowing upon itself, through legislation, a significantly greater role in the implementation of agency rulemaking than the express limits contained in this provision.

Unlike the framers of the United States Constitution, the voters of Michigan who, in 1963, adopted our present state constitution were not constrained in their ability to envision the modern administrative state, yet the limited role for the Legislature described in Const 1963, art 4, § 37 is the one for which they expressly provided. Consequently, there is

an unavoidable negative implication in this language that is couched in terms of an affirmative, but circumscribed, grant of legislative power.[14] That is, that with respect to the authority of legislative committees to veto the rules and regulations of the executive branch, the Legislature may do what is specifically set forth in this provision *and no more.*

This conclusion is buttressed by the Court of Appeals observation, with which I agree, "that the framers of the constitution were operating under the assumption that the Legislature only had the constitutional authority to affect agency rules by bills . . . ." 222 Mich App 400. Specifically, in 1958, an opinion of the Attorney General concluded that, despite a statute permitting it, "the legislature by the adoption of a concurrent resolution may not constitutionally suspend, alter or abrogate a rule or regulation promulgated by a state agency . . . . Neither can a joint committee of the legislature . . . ." 2 OAG, 1958, No 3352, pp 246, 254 (October 8, 1958).

The convention record reveals that, as originally proposed, art 4, § 37, would have expressly authorized delegations of authority to administrative agencies to establish rules or regulations of general applicability, reserving in the Legislature the power to sus-

---

[14] There is nothing unusual about the principle that language couched in terms of an affirmative grant can also reasonably imply a restriction. As an illustration, most drivers in Michigan are aware that, absent some posting to the contrary, it is permissible to make a right turn at a red light. Suppose a sign was posted at a particular intersection that read: "Right turn on red permitted 5:00 P.M. to 7:00 A.M." Would it not be a reasonable inference to conclude that turning right on a red light is prohibited at that intersection between the hours of 7:00 A.M. to 5:00 P.M, even though the restriction is couched in terms of an affirmative grant of power and, without the sign, drivers would be able to turn right on red at any hour of the day?

pend or annul such rules *by legislation*, while permitting a legislative committee to suspend such rules until the next session of the Legislature. The delegates were informed by the Chairman of the Committee on Legislative Powers that the effect of this language would be to increase the power that could be exercised by a legislative committee, on the basis of then present law as interpreted by the Attorney General. 2 Official Record, Constitutional Convention 1961, p 2419. When the proposed provision was amended to reflect its present language, the Chairman of the Committee on Legislative Powers was asked to give examples of why art 4, § 37 was necessary. The chairman responded by describing two incidents when the revenue department had promulgated rules and the Legislature had to quickly "pass legislation to correct what we considered injustices in that field. . . . They corrected by legislative acts, which is the only way they could do it . . . ." 2 Official Record, Constitutional Convention 1961, p 2970.

Whether the Attorney General was correct in concluding that the Legislature was previously unable to affect agency-promulgated rules except by legislation is not critical here. What *is* critical is that, while working under that presumption, a carefully limited grant of authority to only temporarily suspend agency rules is what the framers drafted, and it is what the voters ratified. Clearly, neither the framers of this new constitution, nor the ratifying voters, were precluded from changing what they then believed to be the state of the law, inasmuch as whatever constitutional language they adopted would be this state's highest law. Hence, this history strongly supports the negative implication that flows naturally from the lim-

iting language in the affirmative grant of power in art
4, § 37.

The dissent examines this same convention record,
focusing exclusively on the fact that the purpose of
art 4, § 37 was to provide the Legislature with some
means of checking executive rulemaking that occurs
between legislative sessions, instead of also consider-
ing the inference drawn from the framers' conclusion
that such a grant of express authority was necessary
in the first place. The dissent then concludes that
"[t]he record does not support the concurrence's 'lim-
ited grant' analysis." *Post* at 163. However, this rea-
soning ignores the scope of legislative power to affect
agency rulemaking that the framers understood to
exist absent art 4, § 37, and instead implies that the
framers' understanding was wrong. Although I agree
with the dissent's statement that, with regard to art 4,
§ 37, "a majority of delegates were concerned with
ensuring legislative power, rather than limiting it,"
that concern arose from the limits on legislative
power that those same delegates understood to be
imposed by the sum of the other provisions of the
constitution. *Post* at 163. How can one turn to the
convention record in order to consider intent, accept
that art 4, § 37 was intended to grant additional
power to the Legislature, but not accept the framers'
view on the scope of legislative power absent art 4,
§ 37?[15]

---

[15] I have already noted that my own reading of the balance of the provi-
sions of the 1963 Constitution would not require a finding that the Legisla-
ture would be limited to enacting new legislation in order to block the
promulgation of agency rules. But, unlike the dissent, I do not view myself
to be at liberty to reject the framers' opinion on that subject that is
implicit in art 4, § 37.

The dissent concedes that "[t]he prevailing view was that art 4, § 37 was *needed* to close a loophole previously exploited by executive agencies." *Post* at 163 (emphasis added). Yet, according to the dissent's interpretation, art 4, § 37 was wholly unnecessary because the framers inaccurately viewed the balance of the 1963 Constitution as limiting the power of the Legislature to simply pass a law like 1977 PA 108, thus eliminating any problem with rules being promulgated between legislative sessions. This is a novel method of divining constitutional meaning, i.e., inquiring not into what the framers actually intended and accomplished, but into what they would have intended and accomplished had they thought differently. Instead, this Court should avoid construing the constitution in a way that renders a provision effectively inoperative. *House Speaker v Governor*, 443 Mich 560, 585; 506 NW2d 190 (1993). If art 4, § 37 is a limited, but *necessary*, grant of *additional* power, the obvious implication is that, absent this provision, the Legislature could not wield even this limited power, let alone a greater power, to affect agency rules that have been promulgated pursuant to previously enacted enabling statutes.

Consequently, I agree with the dissent's recognition that art 4, § 37 serves only as a "stopgap" measure. However, I respectfully disagree with the dissent's conclusion that this provision does not foreclose broader participation by the Legislature in rulemaking, or that Michigan's presumption of statutory constitutionality requires that we interpret art 4, § 37 so as to reconcile it with the constitutionality of 1977 PA 108. Such a reconciliation would be contrary to the plain meaning of the words in art 4, § 37 as under-

stood by the people who adopted the 1963 Constitution. See *Bond, supra* at 699. As Justice Cooley's admonishment reminds us:

> Every constitution has a history of its own which is likely to be more or less peculiar; and unless interpreted in the light of this history, is liable to be made to express purposes which were never within the minds of the people in agreeing to it. . . . [This Court's] duty is to enforce the law which the people have made, *and not some other law which the words of the constitution may possibly be made to express.* [*Harding, supra* at 485 (emphasis added).]

If 1977 PA 108 could be reasonably reconciled to comport with art 4, § 37 and its history, I would not oppose doing so, but the authority relied on by the dissent cannot justify changing art 4, § 37 to comport with 1977 PA 108. [16]

---

[16] Oddly, the dissent places reliance on the undisputed proposition that a statute enjoys a presumption of constitutionality, and that we are duty bound to construe statutes, if we can, so that they conform to constitutional requirements. See *McDougall, supra* at 24; *People v Bricker*, 389 Mich 524, 528; 208 NW2d 172 (1973). However, the dissent does not even purport to offer an interpretation of 1977 PA 108 that would accomplish such a reconciliation. Rather, the dissent simply announces this well-accepted rule of statutory construction as if, *eo ipso*, it supported the dissent's interpretation of art 4, § 37 ("if the APA and art 4, § 37 can be reconciled, they must be"). *Post* at 158. It is no "reconciliation" to proclaim, as does the dissent, that this statute and constitutional provision address different circumstances and that nothing in art 4, § 37 prohibits the JCAR review process. That is merely a conclusion drawn from the dissent's own interpretation of art 4, § 37 and, hence, cannot logically be a premise for arriving at the conclusion from which it is drawn.

There is no rule of construction of which I am aware that requires the original meaning of a constitutional provision to yield in order to save a statute. Following the dissent's logic, the Legislature could effectively rewrite the entire 1963 Constitution by enacting new statutes that would require this Court to accept only those constitutional interpretations that would preserve the new statutes. The meaning of art 4, § 37 cannot be affected by the enactment of new legislation.

After comparing Const 1963, art 4, § 37 with the role that 1977 PA 108 attempts to bestow on the JCAR (and the Legislature acting without compliance with the Presentment Clause), one cannot but conclude that 1977 PA 108 is an impermissible expansion of the explicitly limited role provided for the Legislature in the veto of agency rules by Const 1963, art 4, § 37 and, therefore, an encroachment upon the powers assigned to the Executive by the 1963 Constitution.

C

In assessing the constitutionality of 1977 PA 108, I am also guided by the fact that the ultimate source of political power in Michigan, the people—the same "we the people" who ratified the 1963 Constitution and whose constitutionally expressed intentions this Court is obligated to effectuate—were presented in 1984 with Proposal A, which would have amended art 4, § 37 to expressly permit the type of legislative approval of proposed agency rules at issue here. The voters rejected this proposed amendment, and I believe that significant weight must be accorded to that rejection.

I am cognizant of the often dubious exercise of attaching meaning to the inaction of a legislative body, particularly insofar as silence in the face of court decisions can be regarded as "legislative acquiescence." See *Donajkowski v Alpena Power Co*, 460 Mich 243, 258-261; 596 NW2d 574 (1999) ("sound principles of statutory construction require that Michigan courts determine the Legislature's intent from its *words*, not from its silence"). However, a rejection of a proposed constitutional amendment by a popular vote of the people cannot be equated, in my judg-

ment, with legislative silence because, unlike the temporary nature of each passing Legislature, the people of this state, in a political sense, are an enduring and unchanging institution. "We the people" are the one political constant since the enactment of our constitution.[17]

To appreciate the distinction, one must appreciate *why* legislative acquiescence is such a weak indicator of legislative intent. A long line of cases, state and federal, has recognized with respect to congressional intent that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v Price,* 361 US 304, 313; 80 S Ct 326; 4 L Ed 2d 334 (1960).[18] This Court's recent disapproval of legislative acquiescence in *Donajkowski, supra* at 258-261, implicitly recognized that the only legislative intent that is relevant to interpreting a statute is the intent of the Legislature that enacted it. Consequently, subsequent inaction by a *different* Legislature, whether it be silence or the rejection of an alternative proposal, cannot properly serve as an indi-

---

[17] As a political institution, the people are unique. "All political power is inherent in the people." Const 1963, art 1, § 1. "We the people" may recall elective officers without subjecting the reasons for doing so to judicial review. Const 1963, art 2, § 8. "We the people" have the right to propose laws, and enact or reject proposed laws, or to approve or reject laws enacted by the Legislature. Const 1963, art 2, § 9. "We the people" are not subject to being replaced in the next election or being recalled. "We the people" face no term limits or quorum requirements, and "we the people" do not derive our power from the consent of those we serve. "We the people" may propose constitutional amendments, a function that requires a two-thirds majority of both houses to otherwise accomplish, and regardless of how such amendments are proposed, it is "we the people" who ultimately decide whether such amendments become effective. Const 1963, art 12, §§ 1 and 2.

[18] See also, e.g., *Jones v United States,* 526 US 227, 236-240; 119 S Ct 1215; 143 L Ed 2d 311 (1999); *Pension Benefit Guaranty Corp v LTV Corp,* 496 US 633, 650; 110 S Ct 2668; 110 L Ed 2d 579 (1990).

cator of what a prior Legislature intended. Given, however, that the people are not a political institution akin to the Legislature, which is transformed every two years, a subsequent vote of the people, the same "we the people" who adopted the 1963 Constitution, *does* provide relevant insight into the intent of the appropriate enacting body.

Although it is possible to speculate regarding the subjective motivations of those voting against Proposal A, the only reasonable inference, in my judgment, that can be drawn from this rejection is that the people did not want the proposed provision to become part of the Michigan Constitution. The dissent suggests that the defeat of Proposal A is "irrelevant" because voters reject proposals for a variety of reasons and that such defeated proposals do not become law. This argument focuses only on the direct legal ramifications of a defeat to the proposal itself, and ignores the legislative insight that can be drawn from this defeat as to the intent of the enduring political body that previously adopted the 1963 Constitution.[19]

---

[19] Construing the rejection of Proposal A in any manner other than its most obvious implication, i.e., that the people desired not to add a more far-reaching legislative veto provision to their constitution, would be to ignore the historical context of the vote. As noted, the constitutionality of 1977 PA 108 had been in considerable doubt from its inception. See, e.g., *Request for Advisory Opinion on Constitutionality of 1977 PA 108*, *supra*. Subsequently, in 1983, the United States Supreme Court issued its opinion in *Chadha*. Given the relatively high incidence with which state courts tend to adopt the constitutional reasoning of the United States Supreme Court, even when not required to do so, it is a highly questionable proposition that anyone in Michigan in 1984 was truly certain that 1977 PA 108 could withstand a constitutional challenge. Hence, it is inconsistent with the historical reality to suggest that there may have been a more subtle reason for the people's rejection of the proposal—namely, that even though the people truly desired this power in their Legislature, they were confident that the Michigan Constitution already permitted

Indeed, I strongly disagree with the dissent's assertion that this popular vote of the people, expressly provided for by the constitution, is "irrelevant" to the present analysis. To disagree about the exact *meaning* of such a vote is understandable. But there is no basis for derogating the *significance* of the electorate's exercise of their constitutional authority as merely a "ballot-box rejection" that came twenty years too late. Indeed, there is no more constitutionally significant event than when the wielders of "[a]ll political power" under that document, Const 1963, art 1, § 1, choose to exercise their extraordinary authority to directly approve or disapprove of an amendment thereto. Const 1963, art 12, §§ 1 and 2. The proposed amendment here was widely debated by the people and their representatives, as well as within the media. Well over three million voters, presumably after reflecting upon the merits of the amendment, marked "yes" or "no" on ballots that described "A PROPOSAL TO ALLOW THE LEGISLATURE TO APPROVE OR DISAPPROVE ADMINISTRATIVE RULES," with approximately three-fifths of those voters marking "no."

Apparently, in the eyes of the dissent, these voters were laboring under a misapprehension that the exercise of this authority was somehow relevant to the governance of this state. Little did they know, however, that only if they had *approved* the amendment would their decision have been deemed relevant later by some justices of this Court. Apparently because they made the "wrong" choice, their vote is now deemed by the dissent to be "irrelevant" in shedding

---

such legislative review of agency rules and therefore believed that Proposal A was redundant.

light upon what meaning this same electorate accorded to the constitution when they ratified it in 1963.[20]

Further, contrary to the dissent's characterization, I do not assert, or imply, that "we the people" directly rejected 1977 PA 108 because the language it added to the APA mirrors that of the defeated Proposal A. Rather, the vote on Proposal A obviously did not involve 1977 PA 108. The will of the electorate, as expressed by their rejection of the proposal, is relevant only inasmuch as it provides insight into what the people understood art 4, § 37 to mean when they ratified it. A rejected proposal does not "trump" legislation, but a constitutional provision *does*.[21]

---

[20] The dissent disclaims any opinion on "whether the JCAR review process is prudent," and suggests that it is *my* reasoning that is somehow concerned with "whether the voters' rejection of Proposal A in 1984 was 'right' or 'wrong.' " *Post* at 159-160, n 4. However, I believe that the dissent deeply misapprehends my point. I have simply pointed out the incongruous approach of the dissent's willingness to attach significance to the voters' *approval* of a proposal while wholly discounting the voters' *rejection* of the same proposal. Despite its disclaimer, it is the *dissent's* approach that purports to pass judgment on the substantive decision making of the people, by finding significance only in their approval of a measure, and ignoring the significance in their disapproval.

[21] The dissent uses a metaphor about "Mary" and her favorite color to illustrate the proposition that, if the facts were different, no relevant inference could be drawn from the 1984 expression of will by "we the people." However, substituting the actual facts, the same illustration would go something like this: On Monday, Mary gave some indication that her favorite color was blue. On Thursday, it becomes important to know what Mary's favorite color was on Monday, and someone points out that on Wednesday, Mary unambiguously stated that her favorite color was blue. Because Mary is a constant, her expressed preference on Wednesday provides some relevant information regarding her likely expressed preference two days earlier. By comparison, if this was a metaphor about legislative acquiescence, an expression of a different person's favorite color on Wednesday would provide no useful insight regarding Mary's favorite color on Monday.

Therefore, I believe that it is not "acquiescence" when "we the people" exercise the ultimate political power under our constitution and vote against expressly permitting one branch of the government to exercise a particular control over another. I view the rejection of Proposal A as a meaningful expression of will of the people, the same people whose intent is necessary to an understanding of the 1963 Constitution.

CONCLUSION

I find this to be a far closer case than do my colleagues with whom I concur, but nonetheless would also conclude that 1977 PA 108 is unconstitutional because: (1) it exceeds the express limitations on the Legislature's involvement in agency rulemaking under Const 1963, art 4, § 37, and (2) it conflicts with the expressed will of the voters who rejected Proposal A in 1984.

Unlike the lead opinion, however, I would not focus strictly on the moment when the JCAR or the Legislature attempts to veto rules in order to assess the constitutionality of such conduct. Rather, I would focus on the constitutionality of the larger process, which recognizes that the statutory authorization for such involvement fully complied with the enactment and presentation requirements. Further, I do not view a legislative veto, which serves only to preserve the constitutional role of the Legislature as the principal enactor of fundamental policy decisions, to be an invalid exercise in "legislating" without adherence to the enactment and presentation requirements of the Michigan Constitution. Rather, I believe that a system in which essentially legislative decisions are made by

the executive branch of government poses a greater threat to the separation of powers mandate of Const 1963, art 3, § 2. If not for the specific language of art 4, § 37, and the people's rejection of Proposal A, I would favor upholding 1977 PA 108.[22]

I agree with the analysis in parts II(B), II(C), and II(D) of the lead opinion concerning the severability of the offending portions of §§ 45 and 46 of the APA, the constitutionality of the instant enabling act pursuant to current nondelegation doctrine, and the validity of the challenged rules in view of the scope of rulemaking authority granted to the MDOC by MCL 791.206; MSA 28.2276.[23] For these reasons, I concur in the overall conclusion articulated in part III of the lead opinion.

CAVANAGH, J. (*dissenting*).

### I. INTRODUCTION

I cannot join the lead opinion because it fails to recognize important distinctions between state and federal law. It further fails to distinguish the factual situation presented in *INS v Chadha*, 462 US 919; 103 S Ct 2764; 77 L Ed 2d 317 (1983), from that presented

---

[22] In a tripartite republican form of government, a primary check on the power of any particular branch is the resistance of the other two branches to being displaced. Hence, one practical result of this Court's decision today may be that the Legislature will more scrupulously guard the authority that it bestows upon agencies. Agencies themselves, which must ultimately rely on the Legislature for funding and are susceptible to having their rules superseded by statute, may also find themselves subject to other more subtle means of legislative influence. Recognizing the foresight of James Madison at the federal constitutional convention, it is possible " 'that in doubtful cases the policy [will] soon take place of limiting the duration of [enabling acts] as to require renewal instead of repeal.' " *Chadha, supra* at 954, n 18, quoting 2 Farrand, The Records of the Federal Convention of 1787, p 587.

[23] But see also n 13.

today. I agree with the concurrence that a statutorily authorized legislative veto is not unconstitutional per se, and also agree that 1977 PA 108 does not violate the Enactment and Presentment Clauses of the Michigan Constitution. I do not, however, agree that §§ 45 and 46 are unconstitutional, and do not agree that §§ 45 and 46 conflict with the express will of the voters. I would hold that §§ 45 and 46 of the Administrative Procedures Act (APA), MCL 24.245, 24.246; MSA 3.560(145), 3.560(146), 1977 PA 108, are constitutional and that the Department of Corrections (DOC) rules are invalid because they do not conform with the requirements of the APA. Therefore, I respectfully dissent. Because I would uphold §§ 45 and 46, I would not reach the issue of severability.

## II. ISSUE

The central issue comes down to this: when an executive agency proposes rules pursuant to a limited delegation of authority, may a joint legislative committee disapprove the rules as part of a statutorily mandated rule-creation process? The defendants assert that the DOC rules are valid because §§ 45 and 46 of the APA are unconstitutional. The plaintiffs counter that §§ 45 and 46 are constitutional, and if found unconstitutional, are not severable from chapter 3 of the APA. If §§ 45 and 46 are found constitutional and severable, the plaintiffs contend that the delegation of authority must fail as overbroad.

The argument does not hinge on whether the exertion of power by an agency is unconstitutional even though it conforms with the APA. Instead, the question is: (1) whether the delegation can still be considered constitutional if §§ 45 and 46 are invalidated, and (2)

if the delegation is valid, whether an executive agency can pass rules without complying with the requirements of the APA.

### III. MICHIGAN LAW

#### A. RELEVANT HISTORY

The questionable DOC rules put into force without Joint Committee on Administrative Rules (JCAR) review came to fall on the courthouse steps after being tossed between the legislative and executive branches. In order to examine the validity of APA §§ 45 and 46, it is imperative to understand the history that necessarily attaches to an agency rule. The genesis of the DOC rules can be traced to the enactment of the APA. The APA became law as a product of the normal legislative process: enactment by introduction and passage of a bill that was eventually presented to and signed by the Governor. MCL 24.201 *et seq.*; MSA 3.560(101) *et seq.* The enabling statute that conferred rulemaking power upon the DOC in the first place was also enacted pursuant to constitutional procedures. MCL 791.206; MSA 28.2276. From that point, the ball bounced to the executive branch, and the DOC had the power to promulgate rules within the bounds of authority delegated by the Legislature. Limitations were placed on the DOC by the enabling statute as well as by the APA. Here, the DOC crafted rules and submitted them to JCAR as required by the APA. By determining that the DOC stepped outside its delegated power, the Legislature volleyed the ball back to the executive branch. In response, the DOC then decided to play by its own rules. The DOC failed to comply

with the APA when it proceeded to file proposed rules in the face of JCAR disapproval.

From a legal perspective, the enactment of the APA and the enactment of the enabling statute providing for DOC rule creation clearly constituted "legislation" for the purposes of the Enactment and Presentment Clauses. They were introduced by bill, presented to the Governor, and were enacted. When the enabling statute delegated power to the DOC, constitutional rules governing delegation became applicable. The DOC failed to comply with the APA by submitting rules for filing without a certificate of JCAR approval. A question of rule validity then arose. Now the debate turns on whether the rules should be upheld on the grounds that the APA is unconstitutional, or whether the rules should be invalidated because of a procedural failure. I believe that §§ 45 and 46 are constitutional because JCAR review is not equivalent to "legislation." Further, the DOC rules should be invalidated in conformity with Michigan cases recognizing that procedural safeguards must be followed during the rulemaking process. See, e.g., *Detroit Base Coalition for the Human Rights of the Handicapped v Dep't of Social Services*, 431 Mich 172; 428 NW2d 335 (1988); *Clonlara, Inc v State Bd of Ed*, 442 Mich 230; 501 NW2d 88 (1993); *People v Turmon*, 417 Mich 638; 340 NW2d 620 (1983).

The lead opinion correctly recognizes that this Court may only declare a statute unconstitutional in the face of a clear violation. *Ante* at 112, citing *Gauthier v Campbell, Wyant & Cannon Foundry Co*, 360 Mich 510, 515; 104 NW2d 182 (1960). Similarly, statutes are presumed to be constitutional, and the

challenger bears the burden of proving invalidity.[1]
*Johnson v Harnischfeger Corp*, 414 Mich 102, 112;
323 NW2d 912 (1982); *League General Ins Co v Cata-*
*strophic Claims Ass'n*, 165 Mich App 278, 293; 418
NW2d 708 (1987), rev'd on other grounds 435 Mich
338; 458 NW2d 632 (1990). I would hold that the DOC
failed to meet its burden.

### B. CONSTITUTIONAL PROVISIONS

The lead opinion points to the following state con-
stitutional provisions as key to the determination of
the present case: (1) the Enactment and Presentment
Clauses of Const 1963, art 4, §§ 1, 22, 26, and 33, (2)
the Separation of Powers Clause found at Const 1963,
art 3, § 2, and (3) the rule suspension provision of
Const 1963, art 4, § 7. I agree that these constitu-
tional provisions are relevant to our determination,
but disagree that a collective reading of these consti-
tutional provisions leads to the conclusion that §§ 45
and 46 of the APA are unconstitutional.

In determining whether the Legislature has the
authority to enact a particular statute, we begin with
the proposition that it has the power to do so unless
an express constitutional prohibition is in place. See,
e.g., *In re Brewster Street Housing Site*, 291 Mich
313, 333; 289 NW 493 (1939); *Advisory Opinion on*
*Constitutionality of 1976 PA 240*, 400 Mich 311, 317-
318; 254 NW2d 544 (1977); *Attorney General ex rel*

---

[1] An interesting twist in this case is that the DOC, an executive agency, refused to comply with a statute because it felt that the statute was unconstitutional. It is the action of the DOC in violation of the statute that gave rise to the plaintiffs' claims, while statutory constitutionality is raised as a defense. Thus, it is the defendant, as statutory challenger, who carries the burden of overcoming the presumption of constitutionality.

*O'Hara v Montgomery*, 275 Mich 504, 538; 267 NW 550 (1936). The Constitution of 1963 changed the law in many respects, but the drafters chose to leave the nature of legislative authority intact. Michigan's Legislature still operates pursuant to a broad grant of legislative authority; specific limitations are imposed by the constitution. Conversely, the federal constitution confers limited power on Congress. As this Court stated in *In re Brewster*, *supra* at 333:

> The Constitution of the State of Michigan is not a grant of power to the legislature, but is a limitation upon its powers, while the Constitution of the United States is a delegation of power to the Federal government. [Citations omitted.]

In other words, under state law, that which is not prohibited is presumed to be permitted. Under federal law, that which is not permitted is prohibited.

These principles lead me to disagree with the position of the lead opinion that art 4, § 37 indicates an intent to restrict the Legislature's authority to pass laws governing the delegation of rulemaking power. The lead opinion correctly concludes that art 4, § 37 serves as a "stopgap" measure. It does not follow, however, that § 37 forecloses the possibility that the APA is constitutional. Rather, Michigan's presumption of statutory constitutionality weighs in favor of the plaintiffs. Under principles of statutory construction, if the APA and art 4, § 37 can be reconciled, they must be.[2]

---

[2] Contrary to the assertion of the concurrence, I do not suggest that the constitution must yield to a statute. Rather, a statute must be deemed constitutional unless it is clearly unconstitutional. In my view, if a statute can be reconciled with the constitution, then it is not clearly unconstitutional. Unlike the concurrence, I am aware of a great deal of authority that requires us to interpret a statutory provision as constitutional if it can

Moreover, I disagree with the concurrence that the defeat of Proposal A in the 1984 election has any relevance to the present case. Voters reject proposals for a variety of reasons. The only effect of proposal defeat is that the law remains unchanged. Under the law of this state, a defeated proposal does not become law; enacted legislation does. When the APA was enacted, it became the law of this state in spite of the fact that a prior related proposal was rejected by the voters.[3]

The concurring opinion correctly acknowledges that the state of the law remains intact when a proposal is rejected by the voters. Nonetheless, the concurrence raises proposal rejection as a sword, making it relevant under the guise of ascertaining insight into voter intent. I cannot agree that the ballot-box rejection of a proposal almost twenty years after the passage of our state's constitution provides any relevant insight into the "intent of the enduring political body that previously adopted the 1963 Constitution." *Ante* at 149.[4]

---

be construed in a manner consistent with the constitution. To say otherwise would destroy the presumption of constitutional validity. See, e.g., *Kampf v Kampf*, 237 Mich App 377; 603 NW2d 295 (1999); *Brown v Siang*, 107 Mich App 91, 97; 309 NW2d 575 (1981), citing *Ferguson v Skrupa*, 372 US 726; 83 S Ct 1028; 10 L Ed 2d 93 (1963). See also *Dep't of Natural Resources v Seaman*, 396 Mich 299; 240 NW2d 206 (1976); *Blue Cross & Blue Shield of Michigan v Governor*, 422 Mich 1, 51; 367 NW2d 1 (1985); *People v McQuillan*, 392 Mich 511, 536; 221 NW2d 569 (1974); *Lehnhausen v Lake Shore Auto Parts Co*, 410 US 356; 93 S Ct 1001; 35 L Ed 2d 351 (1973). Art 4, § 37 and the APA are easily reconciled because they address legislative approval under two separate types of circumstances, and because nothing in art 4, § 37 prohibits the JCAR review process.

[3] In any event, voter distaste is not the standard for determining statutory constitutionality.

[4] The concurrence dangerously associates its argument with the question whether the voters' rejection of Proposal A in 1984 was "right" or

The concurring opinion uses the following logic: "We the people" represent a constant in the political process. "We the people" adopted the 1963 Constitution. "We the people" rejected Proposal A in 1984. Therefore, the rejection of a proposed amendment in 1984 reveals that "we the people" intended to constitutionally reject the language of the 1984 proposal. The concurrence implies that the APA has been implicitly rejected by the same "we the people" responsible for the 1963 Constitution because the language of the APA parallels the language of Proposal A. In application, the concurrence would lead to the conclusion that the rejection of a proposal trumps legislation enacted by representatives elected by "we the people." The concurrence defies logic. The delegates to the 1961 constitutional convention voted on a constitutional provision distinct from the amendment proposed in 1984, and the concerns that caused "we the people" to reject a proposal in 1984 were not necessarily the same concerns that drove "we the people" to adopt art 4, § 37 as part of the 1963 Constitution.[5]

---

"wrong." I express no opinion about whether the JCAR review process is prudent. Instead, my analysis focuses on the validity of the JCAR review process that was enacted by the Legislature as the representatives of the people. I do not argue that proposal rejection has no relevance to the governance of this state, but rather believe that the effect of proposal rejection is only that the language of the proposal fails to become the law of the state at the time rejected and in the form presented by the proposal.

[5] Thinking of the equation in more common terms clearly illustrates the logical error: Monday, I asked Mary what her favorite color was, and she said blue. On Tuesday, I again asked what her favorite color was, and she said green. Mary is a constant, *but her intentions are not.* Mary's response on Tuesday does not lead to the conclusion that, on Monday, she intended to say her favorite color was green.

The concurrence tries to refute this example, but the example provided by the concurrence is imperfect. It necessarily rests on the idea that Mary's favorite color never changes. In the concurrence's example, Mary's decision on Monday would be the equivalent of the people's decision dur-

Although the electorate is not subject to the same political considerations as the Legislature, neither does the electorate exist in a vacuum. The law gives little weight to legislative comments made after the passage of a statute or constitutional provision when those comments represent an intent different than that expressed by those who adopted the statute or constitutional provision. See, e.g., *Durant v State Bd of Ed*, 424 Mich 364, 382, n 12; 381 NW2d 662 (1985); *Schmidt v Dep't of Ed*, 441 Mich 236, 282; 490 NW2d 584 (1992) (CAVANAGH, C.J., dissenting). To the extent that the rejection of a proposal can even be considered indicative of legislative intent, the rejection of Proposal A in 1984 carries little weight because construing the rejection of Proposal A as a constitutional

---

ing the 1961 constitutional convention. By analogy, then, the concurrence asserts that, in 1963, "we the people" gave "some indication" that it intended to reject the JCAR review process. I disagree for the reasons stated throughout this opinion.

As explained in the body of this opinion, I do not believe that the rejection of Proposal A creates any useful inference. However, if we are to refer to the rejection of Proposal A, I would note that a different construction is possible. One could say that, in 1963, "we the people" intended to impose a restriction on executive rulemaking power. In 1977, the APA was passed by the Legislature on behalf of "we the people." In 1984, "we the people" chose not to change the state of the law. Thereafter, "we the people" never expressed a desire to change the law even though "we the people" became aware of the implications of the APA in 1984. The concurrence suggests that any interpretation other than its own is at odds with "historical reality." I see no support for such a proposition. I see no reason to conclude that the Legislature may choose to reject proposed legislation for a variety of reasons, but that the voters are so one-dimensional that they could vote against a proposal for only a single reason. Even if one concedes that the only permissible inference to be made from ballot rejection is that the people did not want the proposal to become a part of the constitution, it does not necessarily follow that the people also did not want the proposal to be part of the statutory law of this state. Despite the concurrence's efforts to demonstrate otherwise, I see no meaningful distinction between legislative acquiescence (of which my brother MARKMAN disapproves) and the "popular acquiescence" doctrine created by the concurrence today. Neither logic nor authority support the concurrence.

rejection of JCAR would be clearly contrary to the language of the APA and contrary to the language of the Michigan Constitution. I prefer to refer to laws that have been passed rather than those that have not.

Moreover, the judiciary has developed established rules for discerning the intent behind the laws of this state. The concurrence's novel approach fits nowhere within those rules. We are bound to interpret constitutional provisions with a presumption of constitutionality, *Johnson, supra,* and in such a way that the words are interpreted " 'in the sense most obvious to the common understanding . . . .' " *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971). A "plain" reading of art 4, § 37 does not support the position of either the lead opinion or the concurrence. Instead, a plain reading of art 4, § 37 provides only that

> [t]he legislature may by concurrent resolution empower a joint committee of the legislature, acting between sessions, to suspend any rule or regulation promulgated by an administrative agency subsequent to the adjournment of the last preceding regular legislative session. Such suspension shall continue no longer than the end of the next regular legislative session.

The language of art 4, § 37 does not even mention review of agency rules during the regular legislative session. The concurrence essentially injects words into art 4, § 37.

If we are to consider intent, I would turn to the records of the constitutional convention rather than making an abstract, negative inference from the rejection of a ballot proposal. I disagree with the concurrence's representation of the constitutional record, and with the concurrence's assessment of the fram-

ers' intentions and actions. The record reveals that a majority of delegates were concerned with ensuring legislative power, rather than limiting it. The convention comment to art 4, § 37 states that the provision was designed to "provide[] a legislative check on the rule-making authority of administrative agencies when the legislature is not in regular session." The official constitutional record also reveals that the purpose of art 4, § 37 was to cure a perceived defect in the law that allowed agencies to evade meaningful legislative review of agency rules. 1, 2 Official Record, Constitutional Convention 1961, pp 759, 2419-2425, 2968-2971. The focus was on actions taken between sessions. Only a *minority* of convention delegates expressed concern about the wisdom and constitutional validity of art 4, § 37. *Id.* The prevailing view was that art 4, § 37 was needed to close a loophole previously exploited by executive agencies. *Id.* at 2970-2971. The constitutional record reveals that art 4, § 37 was designed to guarantee that the Legislature would have the power to review agency rules promulgated between sessions. The record does not support the concurrence's "limited grant" analysis. Rather, the record reveals that the framers intended to guarantee legislative oversight. The concurrence's assumption that the framers intended to allow the Legislature to act under limited circumstances, comports neither with the constitutional record nor with the established premise that the framers of the Michigan Constitution intended that the Legislature would be able to act unless expressly prohibited from so doing. See, e.g., *In re Brewster, supra* at 333; *Advisory Opinion on Constitutionality of 1976 PA 240, supra* at 317-318; *Attorney General ex rel O'Hara v*

*Montgomery*, *supra* at 538. The APA provisions at issue involve circumstances different than those described in art 4, § 37, and I see no basis for concluding that the framers intended to accomplish anything other than what is clearly stated in art 4, § 37.

### C. LEGISLATION DEFINED

In Michigan, the constitution requires that all legislation must be by bill, art 4, § 22, and that all bills must be presented to the Governor in order to become law, art 4, § 33. Logically, if an action of the Legislature is something other than "legislation," then the action need not be by bill and need not be presented to the Governor.[6] Thus, the disposition of this case must hinge on the definition of "legislation" under Michigan law.[7]

### 1. *WESTERVELT v NATURAL RESOURCES COMMISSION*

Michigan law supports a finding of APA constitutionality. This Court, in *Westervelt v Natural Resources Comm*, 402 Mich 412, 440; 263 NW2d 564 (1978), offered the following definition of legislation: "the concept of 'legislation,' in its essential sense, is the power to speak on any subject without any specified limitations." Under this definition, I would conclude that the JCAR review process does not constitute "leg-

---

[6] Legislators undertake many actions that do not rise to the level of "legislation." Resolutions and committee work are common examples. The courts and Attorney General have both recognized a distinction between introducing bills and acting by resolution. See, e.g., *Boyer-Campbell Co v Fry*, 271 Mich 282; 260 NW 165 (1935); OAG, 1976, No. 4936 (February 3, 1976).

[7] Like the concurrence, I am unpersuaded by the lead opinion's reference to the law of our sister states.

islation" because the JCAR's power is clearly limited by the terms of the APA.

*Westervelt*'s definition of legislation is noticeably absent from the lead opinion. Although *Westervelt* was a plurality opinion, I find its reasoning useful, and would take guidance from the wisdom of our predecessors. I cannot agree with the lead opinion's casual dismissal of *Westervelt* nor its conclusion that the JCAR is empowered to act without limitation. Rather, *Westervelt*'s discussion of "legislation" sprang from a long line of cases that support a conclusion contrary to that reached by the lead opinion.

The lead opinion makes various references to actions that are "legislative" in nature, but fails to distinguish a "legislative action" from "legislation." Instead, the lead opinion concludes, without citing any authority, that "[w]hen the Legislature engages in 'legislative action' it must do so by enacting legislation." *Ante* at 119. To the contrary, Michigan law recognizes that actions that are "legislative" in nature do not necessarily constitute "legislation." *Westervelt, supra* at 440-441.

In Michigan, the delegation doctrine provides that the Legislature may delegate power that is legislative in nature but may not delegate the ability to create "legislation." *Id. Westervelt* was thus an example of the delegation doctrine in action. There, this Court determined that the executive branch did not usurp legislative power in violation of the separation of powers doctrine when it promulgated rules in compliance with the APA precisely because there is a distinction between a "legislative act" and "legislation." *Id.* If there were no distinction, the Legislature could not validly delegate its authority. See, e.g., *Osius v St*

*Clair Shores*, 344 Mich 693; 75 NW2d 25 (1956). Moreover, Michigan cases that have commented on "legislative acts" support the APA as a valid procedural mechanism serving to ensure that delegations of authority to the executive branch are not unconstitutionally broad. *Clonlara, supra; Turmon, supra; Michigan Farm Bureau v Bureau of Workmen's Compensation*, 408 Mich 141; 289 NW2d 699 (1980).

### 2. LEGISLATIVE ACTION AND THE DELEGATION DOCTRINE

This Court is not hard pressed to find an example of a case in which a separation of powers challenge was launched in response to a rule promulgated by the executive branch. The question today focuses on whether JCAR review of agency rules violates the separation of powers doctrine because the Legislature is "legislating." In the past, the debate generally examined whether the exercise of rulemaking authority by the executive branch constituted the usurpation of a legislative function. *Osius, supra* at 698. The focus was on whether the executive branch violated the separation of powers doctrine by "legislating." Cases that addressed yesterday's question are useful today.

This Court's decision in *Osius* is a good starting place for examining the state of modern law. Although *Osius* was decided before the ratification of Michigan's Constitution of 1963, the principles enunciated in *Osius* have been consistently referred to in post-1963 constitutional jurisprudence. See, e.g., *Dep't of Natural Resources v Seaman*, 396 Mich 299, 309; 240 NW2d 206 (1976); *Turmon, supra. Osius* ex-

amined the validity of legislative delegation in a zoning context. It has subsequently been relied upon as the landmark case establishing the "standards test" as the law of delegation in Michigan. *Westervelt, supra* at 434. The *Osius* standards test provides that the Legislature may delegate certain legislative functions to another body as long as it prescribes guidance standards that "are as reasonably precise as the subject matter requires or permits." *Osius, supra* at 698.

In *Westervelt*, this Court examined the continuing validity of *Osius*. The *Westervelt* Court adhered to the *Osius* standard, and explained how the delegation doctrine related both to the separation of powers doctrine and to due process. *Westervelt, supra* at 437-438. At the end of the day, *Westervelt* held that, while lawmaking power cannot be delegated, the Legislature can delegate power to an administrative agency as long as certain guidelines are observed. *Id.* at 441. *Westervelt* used *Osius* as a starting point, concluding that when *Osius* standards were met, legislative authorization and limitation had occurred. *Id.* According to the Court, the act of delegation provided rules within which the delegate was required to operate and confined the scope of the delegate's power. *Id.* Further, rulemaking did not constitute "legislation" because the delegate executive agency was required to act within limits. *Id.*

*Westervelt*'s rule was then strengthened in *Michigan Farm Bureau, supra*. There, the Court probed the definition of a rule under the APA and concluded that an administrative rule could only be valid if it was (1) within the scope of granted power, (2) issued pursuant to the proper procedures, and (3) was reasonable. *Michigan Farm Bureau, supra* at 149. By

implication, a rule failing to satisfy these requirements would be invalid.

In *Turmon, supra,* this Court examined the definition of "sufficient guidelines" in the context of constraining and directing delegation. *Turmon* held that, when an agency appropriately exerts legislatively delegated power, the delegation fits within Michigan's constitutional framework because the Legislature retains policymaking control. *Id.* at 647. The Court specifically noted that "inclusion of the APA provision as mandatory procedure to be followed in the board's rulemaking further insures against possible abuse of delegated power . . . ." *Id.* at 648.

Finally, *Clonlara,* discussed the effect of the APA more directly. There, the Court specifically stated that if an agency attempts to adopt a rule without following the procedure outlined by the APA, then the rule will not have the force and effect of law. *Id.* at 239. Legislatively delegated power can only be validly exercised pursuant to proper procedure. *Id.*

From these cases, it becomes clear that rulemaking pursuant to appropriate statutory procedure, though legislative in character, is not "legislation." Yet, executive agencies have rulemaking power only to the extent that they act within the bounds of power conferred upon them by the Legislature. Thus, the following three rules apply: (1) if the delegation of authority is sufficiently specific, then the delegation of power will be valid, but the executive agency must nonetheless act within prescribed boundaries; (2) if the delegation is not sufficiently specific for the subject matter, then the delegation will be constitutionally invalid; and (3) if the delegation is valid, but the executive

branch steps outside its bounds, then the executive use of power will be invalid.

Clearly, the DOC director's authority to promulgate rules was at least partially derived from the enabling statute, found at MCL 791.206; MSA 28.2276. That statute expressly provides, "[t]he director may promulgate rules pursuant to the administrative procedures act . . . ." MCL 791.206(1); MSA 28.2276(1). Therefore, the delegation of authority under the enabling act is necessarily linked to the delegation of authority under the APA.[8]

Michigan cases have repeatedly recognized that JCAR review is relevant to the delegation process. See, e.g., *Clonlara, Turmon,* and *Michigan Farm Bureau, supra.* By declaring §§ 45 and 46 unconstitutional and then severing those sections from the APA, the lead opinion fails to recognize fully the relationship between the APA and the enabling statute. It simply is not logical to conclude that an agency is not "legislating" when it creates "legislative" rules outside procedural boundaries and beyond its scope of authority, but that the Legislature is "legislating" by reviewing those same rules within procedural boundaries.

Even though this Court has concluded that an agency does not violate the separation of powers doctrine when it promulgates rules in compliance with

---

[8] Recently, the link was expressed more clearly by the Legislature. In 1996, the enabling statute was amended in part as follows:

> If the Michigan supreme court rules that sections 45 and 46 of the administrative procedures act are unconstitutional, and a statute requiring legislative review of administrative rules is not enacted within 90 days after the Michigan supreme court ruling, the department shall not promulgate rules under this section. [MCL 791.206(5); MSA 28.2276(5) (citations omitted).]

the APA, this Court's decisions also state that a rule will be invalid if APA procedures are not followed. Today, the Court steps blindly forward when it upholds the DOC rules and declares §§ 45 and 46 unconstitutional without even considering key Michigan cases.

I would hold that the exertion of the JCAR's veto power does not constitute "legislation." Michigan case law provides that an agency meeting the *Osius* standard need not comply with enactment and presentment procedures during the rulemaking process because the agency is not "legislating." See, e.g., *Seaman, supra* at 309. The process does not magically evolve into "legislation" simply because the rules pass from the desk of an executive officer to a legislator.[9] The Legislature performs some functions that do not constitute "legislation," and I believe that JCAR review is one such function. The JCAR does not have the power to speak without limitation. Instead, JCAR review is merely one part of an intricate procedural system. Further, as stated above, JCAR review does not fall within *Westervelt*'s definition of "legislation."

### IV. THE LEAD OPINION

Even though today's case fits naturally within the framework of state case law, the lead opinion relies primarily on *Chadha* when concluding that JCAR review constitutes a "legislative act." Also, in the

---

[9] Although, I disagree with the concurrence that Michigan-specific circumstances render §§ 45 and 46 unconstitutional, I agree that the balance of power between the legislative and executive branches is endangered by concluding that the executive branch may regulate pursuant to a delegation without satisfying the Enactment and Presentment Clauses, but that the Legislature may not check the executive's use of legislative power through the use of the legislative veto. *Ante* at 136-137.

spirit of *Chadha*, the lead opinion would hold that JCAR review usurps gubernatorial authority in violation of the Presentment, Enactment, and Separation of Powers Clauses of our constitution. In adopting the logic of *Chadha*, the lead opinion concludes that "the provisions of the APA at issue in this case are similar to the legislative veto struck down in *Chadha*." *Ante* at 115. The lead opinion summarizes the four factors utilized in *Chadha* for determining whether congressional action constitutes the type of legislative power governed by Article I of the United States Constitution. *Ante* at 113-114. However, if we are to take guidance from *Chadha*, I would categorize the factors in a slightly different fashion: (1) whether the status of persons outside the legislative branch have been altered, (2) whether the action in question is "legislative in its character and effect," (3) whether the statute involves policy determinations that may only be made by enactment and presentment, and (4) whether the governing constitution prescribes rules for legislative action by one house. *Chadha, supra* at 952-955. As will be discussed below, JCAR review maintains the status quo, is not legislative in character and effect, does not require policy determinations requiring enactment or presentment, and does not involve legislative action by one house. Additionally, although *Chadha* bears some resemblance to the present case, I disagree with the conclusion of the lead opinion that Michigan's JCAR review process carries the same constitutional significance as the legislative veto at issue in *Chadha*.[10]

---

[10] Further, although *Chadha* addressed some of the issues we are faced with today, it should be acknowledged that *Chadha*'s discussion looked

A. "LEGISLATIVE CHARACTER AND EFFECT" OF JCAR REVIEW
AND MAINTENANCE OF THE STATUS QUO

In *Chadha*, the Immigration and Nationality Act, 8
USC 1254(c)(2), was at issue. The act provided that
either house of Congress could pass a resolution
invalidating the United States Attorney General's deci-
sion to allow a deportable alien to remain in the
United States.    *Chadha, supra* at 923.   Section
244(a)(1) conferred upon the Attorney General the
discretion to suspend deportation. Section 244(c)(2)
allowed a single house of Congress to override the
suspension and order that the alien be deported.

Thus, in *Chadha*, Congress conferred upon the
Attorney General the authority to make a decision
regarding the deportation of a particular alien. By
exercising its "legislative veto," it nullified the Attor-
ney General's decision. The result was that the "dele-
gation of authority" conferred no authority at all
because one house of Congress could unilaterally
take away the effect of the Attorney General's deci-

---

beyond the validity of the "legislative veto." Rather, the *Chadha* majority
took great pains to discuss the federalist principles underlying the United
States Constitution, with emphasis on the "Framers' intent." *Id.* at 944-959.
The very first sentence of *Chadha's* Presentment Clause analysis makes
reference to the Constitutional Convention. *Id.* at 946. The analysis then
notes that the federal constitution carefully circumscribes the powers of
Congress. *Id.* at 946-949. With regard to bicameralism, *Chadha* opined,
"[t]he bicameral requirement of Art. I, §§ 1, 7 was of scarcely less concern
to the Framers than was the Presidential veto and indeed the two con-
cepts are interdependent." *Id.* at 948. According to *Chadha*, "Art. I, §§ 1, 7
represents the Framers' decision that the legislative power of the Federal
government be exercised in accord with a single, finely wrought and
exhaustively considered, procedure." *Id.* at 951. Thereafter, the opinion
explained the process to be considered when analyzing a federal statute
within the constitutional framework of art I. *Id.* at 951-959. The procedu-
ral standards applied in *Chadha* are not applicable here. Instead, Michigan
is guided by the procedures outlined in the APA.

sion. Thereafter, the Attorney General remained powerless to respond. Importantly, the "legislative veto" came into play after the Attorney General exercised the delegated authority. That is not the case here. In this case, JCAR review is part of the rule-approval process. Rulemaking authority is not conferred and then taken away; rather, the APA establishes a rulemaking process. The executive agencies have only been delegated the power to act within that process. Also, unlike *Chadha*, the executive agency has the opportunity to revise proposed rules. The plain language of §§ 45 and 46 provide procedures for the executive agency to follow in the face of JCAR disapproval. When the agency follows the provisions of the APA, it has an opportunity to overcome the JCAR's decision. Here, the DOC simply decided to ignore the plain language of the APA because it felt that it was not bound by the statute.

Further, *Chadha* held that the Immigration and Nationality Act was constitutionally flawed because Congress' ability to order deportation was "legislative in its character and effect" and "had the purpose and effect of altering the legal rights, duties and relations" of persons outside the legislative branch. *Id.* at 952. Today's lead opinion similarly opines that allowing JCAR review of administrative rules would affect the rights of individuals outside the legislative branch. Specifically, the lead opinion argues that the JCAR review process interferes with the DOC director's ability to administer his department. Yet, the director only has power to enact rules "pursuant to the administrative procedures act . . . ." MCL 791.206(1); MSA 28.2276(1). JCAR review does not limit the director's

power or alter his rights and duties, rather, the director's power is subject to JCAR review.

Michigan's APA is quite different than the Immigration and Nationality Act. Under Michigan law, rules do not become effective until they undergo JCAR review. MCL 24.245,     24.246; MSA 3.560(145), 3.560(146). The "purpose and effect" of JCAR review is not to "legislate." Rather, JCAR disapproval maintains the status quo ante. Persons who would otherwise be affected by the rules retain the same status because the rules have never been in effect at the time when the JCAR disapproves. The rights of the executive branch similarly remain unchanged because the executive agency never had the authority to promulgate rules outside the scope of JCAR review. Instead, JCAR review is part of the required process. If the agency ignores the procedural requirements imposed by the terms of delegation, then the executive has exceeded the power delegated to it. As such, the analysis simply returns to whether the DOC rules must be invalidated. Michigan law clearly provides that agency rules must be invalidated if procedural standards are not satisfied. Here, the DOC failed to satisfy the constitutionally valid procedural standards of the APA when it proceeded without JCAR approval. Therefore, the rules cannot stand.

### B. ENACTMENT AND PRESENTMENT

When examining enactment and presentment, it is important to recognize the reasons that the Enactment and Presentment Clauses of the United States Constitution were key to *Chadha*. *Chadha* depended on the separation of powers doctrine—by using the legislative veto to alter individual rights other than by

legislation, the legislative branch was stepping outside its prescribed powers. *Id.* at 957-958. However, the federal constitution, unlike our state constitution, contains no express Separation of Powers Clause. The separation of powers argument was reached by making reference to federal precedent, and by noting the "checks and balances" that the federal constitution does explicitly impose. *Id.* Presumably, because Michigan's Constitution does expressly provide for a separation of powers between branches, the result in *Chadha* could be reached without reference to bicameralism or presentment even though *Chadha* explains how enactment, presentment, and bicameralism are directly linked to the separation of powers doctrine. *Id.* at 946. If we are to analogize the present case to *Chadha*, then we must carefully consider *Chadha*'s presentment and enactment arguments.

The lead opinion concludes that JCAR review involves policy determinations akin to those at issue in *Chadha. Ante* at 116-117. Yet, I find that the lead opinion misses the mark. The question is not simply whether the Legislature is engaged in making policy determinations, but whether the Legislature is engaged in making the type of policy determinations that need to be made in the form of legislation. The analysis of the lead opinion is tied to its misconception that any "legislative" action taken by a subset of the Legislature is "legislation." I disagree for the reasons stated in part III of this opinion.[11] In my view, the

---

[11] The lead opinion asserts that the JCAR review process must be invalidated because it allows legislative action to go unchecked. Instead, the lead opinion concludes, "the Legislature's action exerts a 'policy-making effect equivalent to amending or repealing existing legislation.'" *Ante* at

action taken by the DOC was more akin to legislation than is the JCAR review process. Because this Court has already decided that agency rulemaking does not constitute impermissible "legislation" as long as necessary guidelines are followed, I would further conclude that review of agency rules as part of the promulgation process is similarly not "legislation." Therefore, JCAR review does not violate the Enactment and Presentment Clauses of our constitution.

### C. BICAMERALISM[12]

*Chadha* is also clearly distinguishable because it repeatedly made reference to "the one-house veto," and placed importance on the bicameralism requirement of the United States Constitution. JCAR review is clearly not the same thing as a one-house veto.[13]

---

117, n 8, quoting *New Jersey General Assembly v Byrne*, 90 NJ 376, 388; 448 A2d 438 (1982) (emphasis omitted).

I do not agree that JCAR review is akin to the process of amending or repealing legislation. Rather, JCAR review holds the status quo ante in place. If an analogy is to be made, JCAR review would be more akin to a proposal introduced into a legislative committee than to an amendment to legislation. A proposal will only later become subject to the Enactment and Presentment Clauses if it *passes* and follows the appropriate procedural rules. Surely, the lead opinion would not hold that every failed proposal must be submitted to the Governor. In fact, the constitution states, and the lead opinion acknowledges, that the Enactment and Presentment Clauses require that all *bills* passed by the Legislature be presented to the Governor. Article 4 provides examples of actions taken by the Legislature that need not be done by bill. A perfect example is art 4, § 37, which allows the Legislature to act by concurrent resolution. Similarly, JCAR review is a legislative action that does not constitute "legislation."

[12] As a matter of terminology, it is important to recognize that Michigan's "Legislature" is the entire bicameral legislative branch, consisting of the House of Representatives and the Senate.

[13] The lead opinion misapprehends the enactment and presentment arguments put forth by petitioner and amici curiae. I understand the argument as being that the APA should be presumed constitutional because nothing in Michigan's constitution limits the Legislature's ability to enact

Instead, the JCAR is a joint committee, composed of both senators and representatives. MCL 24.235; MSA 3.560(135). When the JCAR disapproves of a rule, both houses are given notice and an opportunity to pass a joint resolution. MCL 24.245; MSA 3.560(145).[14]

### V. CONCLUSION

Regardless of the *Chadha* view to which one subscribes, it is clear that the constitutional analysis in *Chadha* was directly tied to the text of the United States Constitution and the federal Immigration and

---

legislation requiring rule review by a joint committee as part of the rule promulgation process.

[14] The statute provides as follows:

(9) If, within the time period provided by subsection (6), the committee *disapproves the proposed rule* or the committee chairperson certifies an impasse after votes for approval and disapproval have failed to receive concurrent majorities, the committee shall immediately report that fact to the legislature and return the rule to the agency. *The agency shall not adopt or promulgate the rule unless 1 of the following occurs*:

(a) The legislature adopts a concurrent resolution approving the rule within 60 days after the committee report has been received by, and read into the respective journal of, each house.

(b) The committee subsequently approves the rule.

(10) If the time permitted by this section expires and the committee has not taken action under either subsection (8) or (9), then the committee shall return the proposed rules to the agency. The chairperson and alternate chairperson shall cause concurrent resolutions approving the rule to be introduced in both houses of the legislature simultaneously. Each house of the legislature shall place the concurrent resolution directly on its calendar. The agency shall not adopt or promulgate the rule unless 1 of the following occurs:

(a) The legislature adopts a concurrent resolution approving the rule within 60 days after introduction by record roll call vote. *The adoption of the concurrent resolution requires a majority of the members elected to and serving in each house of the legislature.*

(b) The agency resubmits the proposed rule to the committee and the committee approves the rule within the time permitted by this section. [Emphasis added.]

Nationality Act. Similarly, our analysis should begin with Michigan's law. As stated previously, Michigan law requires a different outcome than occurred in *Chadha*. Furthermore, the JCAR review process is distinguishable from the "legislative veto" at issue in *Chadha*. Pursuant to state law, I would hold that §§ 45 and 46 are constitutional. When the DOC failed to follow the procedural requirements of §§ 45 and 46, it exceeded the scope of its rulemaking authority. I would hold that the rules promulgated by the DOC are invalid, and would reverse the decision of the Court of Appeals.